THE BOARD OF COMMISSIONERS OF FLATHEAD COUNTY ET AL., PETITIONERS, v. ELEVENTH JUDICIAL DISTRICT COURT, RESPONDENTS.

No. 14167.
Submitted Dec. 21, 1978.
Decided July 5, 1979.
597 P.2d 728.

Patrick M. Springer, Russell Jones (argued), Kalispell, for petitioners.

Robert S. Keller (argued), Kalispell, for respondents.

G. Steven Brown (argued), Helena, for amicus curiae.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

Original proceeding by the Board of County Commissioners of Flathead County upon a petition for declaratory judgment.

This matter has a long and involved history. It arises out of a dispute between the Flathead County Board of County Commissioners and the judges of the District Court of the Eleventh Judicial District over funding of the position of Director of Family Court Services in Flathead County. That position was created in 1974 by the judges and the commissioners to meet responsibilities and duties arising under the Montana Uniform Marriage and Divorce Act, the Montana Conciliation Law, and various other statutes relating to family matters. During its first year, the position of Director of Family Court Services was funded by a grant from the State Department of Social and Rehabilitation Services. Thereafter, through fiscal year 1976-77, funding was provided by the county in the District Court budget.

The customary procedure in Flathead County in regard to funding the operations of the District Court was that, prior to the annual submission of their proposed yearly budget, the judges would meet with the commissioners to discuss anticipated programs and expenditures. After a series of such meetings, the proposed budget for 1977-78, including funding for the Director of Family Court Services position, was submitted to the commissioners by the judges on June 13, 1977. The commissioners refused to appropriate any funds for the director position. Numerous further meetings between the commissioners and the judges were held, but the commissioners were adamant.

The original reason given by the commissioners for refusing to fund the position for 1977-78 was that they disapproved of the

man the judges wanted to retain as director. In the controversy that ensued from their denial of funding, however, the commissioners changed their stance and contended they refused to approve the requested budget because the director position was allegedly an unnecessary duplication of services already available in the community from other county and state agencies and from psychologists, counselors, and various other professionals in the private sector. We note that at the time this controversy became ripe, the Director of Family Court Services was supervising more than 65 cases involving custody, visitation, and children's rights, and overseeing in excess of 60 post-dissolution custody cases per month.

On August 23, 1977, after the numerous meetings between the commissioners and the judges had not resolved the matter, the District Court of the Eleventh Judicial District entered an order directing that the position in question be funded. The commissioners defied that order. On September 2, 1977, an order to show cause why they should not be held in contempt of court issued against the commissioners. A hearing on the order to show cause was held on September 23 before a district judge called in from another judicial district. Findings of fact and conclusions of law filed by the presiding judge thereafter adjudged the commissioners in contempt for defying the order to fund the position of Director of Family Court Services. Subsequently, after further discussion and negotiation, the judges and the commissioners entered into a stipulation whereby the commissioners would comply with the order to fund the position and thereby be purged of contempt, with both sides reserving the right to seek appropriate determination of the legal issues basic to the dispute. On April 11, 1978, the District Court entered an order accepting the stipulation.

During the pendency of the District Court proceedings, the commissioners filed a petition for declaratory relief in this Court. The posture of the matter at that time left it unclear as to what relief or remedy, if any, was proper or available. Therefore, on April 14, 1978, without yet accepting jurisdiction of the petition for declaratory relief, we entered an order, in pertinent part, as follows:

"(1) As this Court is unable to determine on the basis of the material submitted by the parties what factual issues and what legal issues the parties are submitting to this Court for determination, the parties are granted 20 days from the date hereof in which to furnish this Court a written stipulation as to the agreed facts, the agreed issues and the contested facts and issues in this proceeding.

"(2) If the parties themselves are unable to agree to a statement of the facts and issues provided in (1) herein above within said 20 days period this Court will appoint a Special Master at the parties' expense to determine the same."

The parties were unable to agree, and we appointed a Special Master by order dated May 9, 1978. The Special Master and the parties worked out an agreed stipulation of facts and issues and submitted it to this Court on August 4, 1978, together with a report of the Special Master detailing many of the circumstances set out above. On August 10 we accepted the report and the stipulation as determining the facts and issues before this Court and directed filing of briefs.

Among the provisions of the stipulation, those that are most significant to this appeal appear in paragraph nineteen:

"The parties want to determine the authority of County Commissioners to fix and determine the judicial budget and, therefore, for the purpose of this stipulation, we agree that:

"1) Assuming that the failure to fund was for the purpose. of discharging [the current director], it is not relevant to the determination of the legal issues in this case.

"2) Any past funding of the position of the Director of Family Court Services is not relevant to the determination of the legal issues in this case.

"3) The . . . sole legal issues [this Court is asked to address] . . . are:

"[a] It is the [District Judges of the Eleventh Judicial District's] position that any order made by a District Judge that is both legal and necessary (which includes reasonableness) must be obeyed,

whether the order be promulgated by reason of statute, constitution, or the inherent power of the Court.

"[b] It is the [Board of Commissioners' of Flathead County's] position· that County Commissioners have the right to review budgets (which includes the right to reduce or expand) without regard to the legality or necessity of the proposed budget; that in addition, § 16-1901, R.C.M.1947, gives the County Commissioners this right, and that the District Court is a 'county department' within the meaning of that act.

"[c] Is the District Court required to submit a budget, annually, to the County Commissioners, and if so, must this be an 'itemized' budget, as distinguished from the submission by the District Judges of an 'advisory' budget as a matter of courtesy."

It is apparent from these issues as finally phrased that when this matter was turned over to the Special Master it was transformed from a controversy limited to a determination of rights between two litigants to a request for us to lay down far-reaching guidelines to govern the establishment of court budgets by District Courts and county governments throughout the state. This we decline to do. We have carefully considered the complexities of Montana's system ·of funding the operation of the District Courts through local appropriations, and we conclude that any attempt to formulate the kind of guidelines petitioners seek would, on the record before us, be a futile exercise. It is a delicate issue. See for example, Comment, *State Court Assertion of Power to Determine and Demand its Own Budget*, 120 U.Pa.L.Rev. 1187 (1972). More thorough statewide studies of current practices and expert evaluation of needs and goals is required. Until such information becomes available, we would be remiss to disturb the budgeting process as it now exists. We therefore narrowly confine our holding in this case to its facts and will so approach any future similar cases as they arise.

We now turn to a discussion of the issues. The first item in the stipulation upon which the case was submitted to us is posed in the parties' briefs as follows: "Must an order made by a district judge that is both legal and necessary (which includes reasonable-

ness) be obeyed, whether the order be promulgated by reason of statute, constitution, or the inherent power of the Court?" Both sides concede that this question, as phrased, is really a nonissue. Of course such an order must be obeyed. What more we could add by way of discussion to what is essentially a truism we do not know.

The parties' primary concern in submitting this first issue to us is embodied in their reference in the final phrase to "inherent power". A substantial portion of their briefs is devoted to discussion of the doctrine of inherent powers whereby courts are deemed to possess, subject to countervailing statutory and constitutional restrictions, all the necessary and usual incidental powers to effectuate a grant of jurisdiction. See 21 C.J.S. *Courts* §§ 31, 86-88. Because of the convoluted course this case followed in coming to us, we do not find it to provide a proper context in which to approach the delicate problems of power under the Constitution and clashes between different branches of government which the parties would have us address. Where more apparent and less sensitive means of resolving a controversy are available, constitutional issues should be avoided. E. g. *Youngstown Sheet & Tube Co. v Sawyer* (1951), 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153, 26 A.L.R.2d 1378 (Frankfurter, J., concurring).

The division of Family Court Services created in Flathead County is responsible, through the judges, for the following (as itemized in the stipulation):

"(a) Screening of all underage marriage applicants, unless some other qualified person does so pursuant to Section 48-308, R.C.M.1947.

"(b) Promoting amicable settlement of marital disputes.

"(c) To determine, promote, and protect the best interests of children and to assure maximum parental support, discipline, guidance, and supervision, pursuant to Section 48-334, R.C.M.1947.

"(d) To reduce and eliminate whenever possible the physical and emotional trauma of parents and their children prior to, during and after contested divorces and marital controversies.

"(e) To investigate all contested parent-child matters, including recommendations and reporting the same to the parties, their attorneys, and the Court, pursuant to Section 48-335, R.C.M.1947.

"(f) When required, to supervise those cases involving emotional problems between the parents.

"(g) To investigate and report within ten (10) days of each referral, all marital controversies where public welfare or ADC [Aid to Dependent Children] funds are involved in [and] so doing to establish a recommendation to the parties and to the Court the amount of support to be paid within the means of the parents."

As mentioned previously, these responsibilities all arise out of statutory duties mandated by various laws relating to domestic relations. The Montana Conciliation Law, for example, in section 40-3-124 MCA, provides:

"*Manner of conciliation.* (1) The judge of the conciliation court may hear all matters invoked under this chapter, or he may refer such matters to a pastor or director of any religious denomination to which the parties may belong, psychiatrist, physician, attorney, social worker, or other person who is competent and qualified by training and experience in personal counseling. Such person shall be referred to herein as the conciliation counselor.

"(2) The conciliation counselor shall:

"(a) hold conciliation conferences with parties to, and hearings, in proceedings under this chapter and make recommendations concerning such proceedings to the judge of the conciliation court;

"(b) cause such reports to be made, such statistics to be compiled, and such records to be kept as the judge of the conciliation court may direct."

The provisions of the Montana Conciliation Law only apply ". . . in counties in which the district court determines that the social conditions in the county and the number of domestic relations cases in the courts" render the conciliation procedures "necessary to the full and proper consideration of such cases and the effectuation of the purposes of [the Conciliation Law]." Section 40-3-104 MCA. The judges of the Eleventh Judicial District made this deter-

mination. Having done so, they were authorized by the above-quoted statute to acquire the services of a conciliation counselor. The fact that they incorporated several other duties arising out of various other domestic relations statutes in this position and expanded its title and responsibilities does not change the statutory mandate from the Legislature for the court to fulfill and the commissioners to fund this function of the District Court. See section 40-3-114 MCA.

The commissioners concede that District Courts are clothed with all the power and authority necessary to render their jurisdiction effective. *Hillis v. Sullivan* (1913), 48 Mont. 320, 147 P. 392. They further admit in their brief that they cannot withhold necessary judicial funding which would be "debilitating to the necessary functions of the judicial branch."

Section 3-1-113 MCA provides:

"When jurisdiction is, by the constitution or this code or any other statute, conferred on a court or judicial officer, all the means necessary to carry into effect are also given. In the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

In our view, appointment of a Director of Family Court Services was a "suitable process or mode of proceeding" for the District Court to follow to carry out its statutorily mandated duties.

From the foregoing discussion, we conclude that the District Court acted properly and was entitled to fund the program. On the circumstances present here, the commissioners' refusal to comply with the funding order was an arbitrary and capricious abuse of the powers of their office. We reiterate that our holding here is narrowly confined to this particular situation. We admonish the District Courts to use the statutorily implied funding power we recognize here with judicious restraint. The constantly changing demands upon the judicial system must be worked out in a spirit of independent identity and balance among legislative, executive, and

judicial branches of government by reasonable interaction tempered with respect for the limitations of their power.

■ The two remaining issues in the stipulation upon which this case was submitted to us are phrased in the briefs as follows:

"I. Do county commissioners have the right to review budgets (which includes the right to reduce or expand) without regard to the legality or necessity of the proposed budget? Does section 16-1901, R.C.M.1947, give the county commissioners this right? Is the District Court a 'county department' within the meaning of the act?"

"II. Is the District Court required to submit a budget annually to the county commissioners, and if so, must this be an 'itemized' budget, as distinguished from the submission by the district judges or an 'advisory' budget as a matter of courtesy?"

The first sentence in issue I above again strikes us as a question phrased in such a way that its answer is implicit in itself. It should be apparent that a budget review undertaken in disregard of legality or necessity would be unlawful. As to the other matters raised in these two issues, Senate Bill 397, signed into law by the Governor on March 31, 1979, renders them moot. This legislation subjects District Court programs funded by the county to the provisions of the County Budget Law.

This cause is dismissed.

MR. JUSTICES HARRISON, SHEA and SHEEHY concur.