[No. S020887. Oct. 29, 1992.]

CITY OF NATIONAL CITY, Plaintiff and Appellant, v.
STEVEN D. WIENER et al., Defendants and Respondents.

COUNSEL

George H. Eiser III, City Attorney, and Linda Kaye Harter, Assistant City Attorney, for Plaintiff and Appellant.

John W. Witt, City Attorney (San Diego), Stuart H. Swett, Chief Deputy City Attorney, Joseph M. Schilling, Deputy City Attorney, David L. Llewellyn, Jr., H. Robert Showers and Gene L. Malpas as Amici Curiae on behalf of Plaintiff and Appellant.

Norman R. Atkins, Weston & Sarno, John H. Weston and G. Randall Garrou for Defendants and Respondents.

OPINION

ARABIAN, J.—The question we consider is the constitutionality of a municipal zoning ordinance that regulates adult entertainment establishments. The precise issue is whether a zoning ordinance that combines both distance regulations and an exception for location of adult businesses in certain shopping malls conforms with First Amendment principles under the standard set forth in *City of Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41 [89 L.Ed.2d 29, 106 S.Ct. 925] (*Renton*). We conclude that the ordinance is constitutional.

I. FACTS AND PROCEDURAL BACKGROUND

City of National City (the city or National City) is located approximately five miles from downtown San Diego. It is highly accessible, crisscrossed by two major freeways, several major arterials, and an abundance of surface street traffic. To the west lies San Diego Bay. Its three other borders lie adjacent to property belonging to other cities and the County of San Diego. It is home to a large naval installation that significantly affects the area in terms of traffic, public resources, and crime.

The city's total area is 8.65 square miles or 5,536 gross acres. Only 3,196 acres, or 58 percent of the city's land, are available for any land use purpose whatsoever. Of those 3,196 acres, 572 acres, or 17.9 percent of the total net acres, are zoned for commercial use; 1,296 acres, or 40.6 percent, are zoned for residential use; 541 acres, or 16.9 percent, are zoned for industrial use; and 787 acres, or 24.6 percent, are zoned for institutional, including military, use.

In December 1986, respondents Steven D. Wiener, individually and doing business as Chuck's Bookstore, and his sister Patricia Sanders (respondents)

opened Chuck's Bookstore, an adult bookstore and arcade, at 929 National City Boulevard in the city.[1] Shortly thereafter, the city brought an action in superior court seeking a preliminary and permanent injunction against the continued operation of Chuck's Bookstore by respondents pursuant to chapter 18 of the city municipal code regulating adult establishments. The city claimed that the bookstore constituted a common law and statutory nuisance,[2] and that the store was operating in violation of certain sections of the municipal code, including section 18.69.030.[3] Respondents ultimately conceded that Chuck's Bookstore violated the ordinance by virtue of its proximity to both another adult entertainment establishment and a residential area, but claimed that section 18.69.030 was unconstitutional.

City municipal code section 18.69.030 (the ordinance) prohibits an adult business from locating within 1,500 feet of another adult business, 1,500 feet of a school or public park, or 1,000 feet of any residentially zoned property. The ordinance limits neither the total number of adult businesses that may locate in the city, nor the hours they may operate. It "grandfathers" existing

---

[1] Prior to opening the Chuck's Bookstore at 929 National City Boulevard, Wiener had operated another adult bookstore and arcade at 829 National City Boulevard. After the earlier store was closed by the city during redevelopment, respondents opened Chuck's Bookstore at 929 National City Boulevard, where it became the subject of the current action.

[2] Although the city's action was for both statutory and common law public nuisance, the superior court's statement of decision relied solely on the statutory basis for imposing the requested injunctive relief. On appeal, the Court of Appeal also addressed only the statutory public nuisance issue and denied the city's petition for rehearing (opposed by respondents) requesting a ruling on the issue of common law public nuisance. Finally, at oral argument before this court, respondents urged the court that given what they characterized as a lack of evidence in the record on the issue of common law public nuisance, and the failure of the lower courts to rule on the issue, it would be inappropriate for us to reach the issue. Accordingly, we decline to resolve this action on the ground of common law public nuisance, and conclude that it is appropriate for us to reach the constitutional issue.

[3] Section 18.69.030 provides in relevant part:

"A. No person or entity shall own, establish, operate, control or enlarge, or cause or permit the establishment, operation, enlargement or transfer of ownership or control, except pursuant to Section 18.69.060, of any of the following adult entertainment establishments if such adult entertainment establishment is within one thousand five hundred feet of another adult entertainment establishment or within one thousand five hundred feet of any school or public park within the city or within one thousand feet of any residentially zoned property in the city, measured along street frontages:

"1. Adult bookstore;
" . . . . . . . . . . . . . . . . . . . .
"3. Adult mini-motion picture arcade (peep shows);
" . . . . . . . . . . . . . . . . . . . .
"C. Nothing in this chapter prohibits the location of adult entertainment establishments within retail shopping centers in all commercial zones wherein such activities will have their only frontage upon enclosed malls or malls isolated from direct view from public streets, parks, schools, churches or residentially zoned property."

The parties stipulated that Chuck's Bookstore is an "adult entertainment establishment" within the meaning of the municipal code.

adult businesses, and hence does not apply to another adult business in the city, the Pussycat Theater.

Mr. Post, the city's Planning Director, testified that the ordinance was enacted after the city had performed a study and conducted one or more public hearings before the city's Planning Commission, and was part of a comprehensive scheme of urban redevelopment. According to Mr. Post, the city suffers the second highest crime rate in San Diego County, and urban decay is rife throughout the city. Its population is largely transient, and its per capita income is one of the lowest in the county. Because of low property values in its residential area, the city is heavily reliant on its commercial tax base for revenue, and there was testimony that the area zoned for commercial use is proportionately larger than in other cities.

Moreover, there was testimony that the neighborhood surrounding Chuck's Bookstore has experienced deleterious effects as a result of respondents' current location.[4] These problems were widely publicized in a series of articles appearing in the local newspaper, the Star News.

The city employs "strip zoning," or commercial zoning on either side of heavily trafficked arterials; thus its commercial zones are generally in close proximity to residential areas. As a result, only 4.5 of the 572 commercially zoned acres not already developed into a shopping mall lie beyond the distance requirements of the ordinance. This parcel of land is located in the southern portion of the city, fronting on National City Boulevard. There was evidence that it currently contains a 9,000-square-foot building and a motorcycle shop.

To allow for a greater number of alternative sites for adult businesses, while still attempting to minimize their negative impact, the ordinance also provides that adult businesses are not subject to the distance requirements, and may locate anywhere within the city's 572 acres of commercially zoned property, if they are located in a retail shopping center. Under this exception, either the frontage of the business must be oriented to an enclosed mall or the business must be in a mall isolated from direct view from public streets, parks, schools, churches, and residentially zoned property.

---

[4]Following the opening of respondents' business at its current location, one neighbor, Ms. Janice Martinelli, observed men urinating in her backyard. Her nine-year-old son found used condoms and pornographic reading material in her yard, and was once chased by one of respondents' customers. Ms. Martinelli no longer allows him to play in the backyard. Prior to June of 1988, when lockable doors on the respondents' viewing booths were removed, one Star News reporter, Mr. Dane David Schiller, testified that he observed a patron placing his penis in a "glory hole" in a viewing booth, and on numerous occasions observed puddles of semen on the floor of the booths. Mr. Rich Chriss, circulation manager and part-time reporter for the Star News, testified that also prior to the removal of the lockable doors, on four or five occasions, he observed male patrons placing their penises in the "glory holes." Mr. Chriss further testified that he observed acts of oral and anal sex in the booths, and anal sex in the alley behind respondents' business.

Three existing shopping centers were identified as fulfilling the enclosed mall requirements: the Plaza Bonita Shopping Center, South Bay Plaza, and Sweetwater Town and Country. While vacancies existed at all three of these malls, not all portions of South Bay Plaza or Sweetwater Town and Country conformed to the specifications of the ordinance. It was estimated that only 5,000 to 6,000 square feet of space at Sweetwater Town and Country, and 12,000 square feet of space at South Bay Plaza, met the ordinance's criteria. Moreover, respondents' expert witness testified that none of these three malls would rent space to an adult entertainment business. The witness recounted telephone conversations with leasing agents from two of the malls during which the witness inquired generally whether those malls would rent space to an adult business, without identifying a particular business.

In addition, new shopping centers may be built or existing malls may be modified in conformance with the ordinance to accommodate adult businesses. Although there was testimony as to the cost and expertise required for such construction, no direct evidence was presented regarding the economic viability of such an enterprise, or the ability of respondents to undertake such development.

Finally, there was evidence that there is currently a trend toward developing small retail shopping centers in Southern California, and that it is relatively easy to undertake this type of development in the city. Mr. Post testified that "developing a church would actually be more difficult than developing an adult entertainment enterprise in National City."

After a three-day trial, the superior court found that the ordinance was a reasonable time, place, and manner regulation designed to serve a substantial government interest. The court also found that the ordinance provided reasonable alternative avenues of communication, noting that "there are shopping centers in existence in [National City] which could accommodate [respondents'] business and comply with the [o]rdinance," and that the city had "demonstrated that an abundant amount of land exists for development of commercial edifices which would conform to the [ordinance] requirements."[5] The court further found that the operation of Chuck's Bookstore at its present location was in violation of the ordinance. On that basis, the court

[5]We note that the trial court's statement of decision characterizes the 572 acres of commercially zoned property as "vacant." Moreover, the Court of Appeal stated in its opinion that the "evidence [was] undisputed that under the ordinance a new or relocating adult entertainment business would be limited to locating" in certain locations, including "572 acres of undeveloped commercial land . . ." However, our review of the record reveals uncontroverted evidence that the commercially zoned property was substantially developed. Since neither party has objected to, or appeared misled by, the lower courts' mistaken characteriza-

granted the city's request for a declaration that Chuck's Bookstore constituted a public nuisance, and permanently enjoined respondents from establishing, maintaining, and operating an adult business, including an adult bookstore, at 929 National City Boulevard.

The Court of Appeal reversed. While the court found that the ordinance was constitutional on its face, and served a substantial government interest, it concluded that the ordinance as applied failed to provide reasonable alternative avenues of communication under *Renton, supra,* 475 U.S. 41. Specifically, the court found that the distance regulations allowed too few alternative sites for adult businesses, and that the "purported" opportunity to locate in enclosed malls was "illusive." This finding of illusiveness derived from both "the apparent aversion shopping mall landlords have toward the presence of adult entertainment shops on the premises," and the court's determination that construction of a new shopping facility "would not be economically feasible for the typical adult business entrepeneur." The court also took into consideration counsel's representation at oral argument that the city "has a population of over 57,000 and has only one adult entertainment business in operation." The court stated that while "not controlling, this factor does indicate that as a practical matter the ordinance is highly restrictive." Accordingly, the court held that the city "has not shown there are practical alternative locations for adult entertainment establishments, and thus ordinance 18.69.030 is an impermissible restriction on protected speech."

## II. DISCUSSION

### A. *Background*

We are guided in our analysis by two landmark decisions of the United States Supreme Court in *Young* v. *American Mini Theatres, Inc.* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440] (*Young*) and *Renton, supra,* 475 U.S. 41. While the Court of Appeal cited *Young* and *Renton*, it failed to apply their express language or heed their underlying rationale.

In *Young*, the Supreme Court upheld two Detroit zoning ordinances that differentiated "between motion picture theaters which exhibit[ed] sexually explicit 'adult' movies and those which d[id] not." (427 U.S. at p. 52 [49 L.Ed.2d at pp. 315-316].) "The principal question presented by th[e] case [was] whether that statutory classification [was] unconstitutional because it [was] based on the content of communication protected by the First Amendment." (*Ibid.*) As the court later explained in *Renton*, "although five Members of the Court did not agree on a single rationale for the decision [in

tions of the property, and we conclude there are reasonable alternative avenues of communication, the discrepancy is of no significance.

*Young*], we held that the city of Detroit's zoning ordinance, which prohibited locating an adult theater within 1,000 feet of any two other 'regulated uses' or within 500 feet of any residential zone, did not violate the First and Fourteenth Amendments." (*Renton, supra,* 475 U.S. at p. 46 [89 L.Ed.2d at pp. 36-37].)

Significantly, Justice Powell, in his concurring opinion in *Young*, observed, "The constraints of the ordinance with respect to location may indeed create economic loss for some who are engaged in this business. But in this respect they are affected no differently from any other commercial enterprise that suffers economic detriment as a result of land-use regulation." (427 U.S. at p. 78 [49 L.Ed.2d at pp. 330-331].)

In *Renton, supra,* 475 U.S. at pages 43-44 [89 L.Ed.2d at pages 35-36], "Renton, a city of approximately 32,000 people," sought to zone adult motion picture theaters by providing that they could not be located "within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school." This distance requirement resulted in a concentration of approved locations for adult theaters. (*Id.* at p. 52 [89 L.Ed.2d at pp. 40-41].) "The ordinance by its terms [was] designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life. . . .'" (*Id.* at p. 48 [89 L.Ed.2d at p. 38].) There was no evidence that "at the time the Renton ordinance was enacted, any other adult business [other than Playtime Theatres] was located in, or was contemplating moving into, Renton." (*Id.* at p. 52 [89 L.Ed.2d at pp. 40-41].)

The court first found that the ordinance was "properly analyzed as a form of time, place, and manner regulation" since the ordinance did not ban adult theaters altogether, but merely provided that such businesses could only be located in certain areas. (*Renton, supra,* 475 U.S. at p. 46 [89 L.Ed.2d at pp. 36-37].) The court also found that the ordinance was content-neutral, since it was "aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." (*Renton, supra,* 475 U.S. at p. 47 [89 L.Ed.2d at pp. 37-38].)

Relying substantially on its earlier decision in *Young, supra,* 427 U.S. 50, the high court then upheld the content-neutral time, place, and manner regulation against a First Amendment challenge, and established a two-part test: (1) whether the ordinance is designed to serve a substantial governmental interest, and (2) whether the ordinance allows for reasonable alternative

avenues of communication. (*Renton, supra*, at p. 50 [89 L.Ed.2d at pp. 39-40].) In addition, the Supreme Court noted that while the First Amendment protects sexually explicit communication, " '[I]t is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . .' " (*Id.* at p. 49, fn. 2 [89 L.Ed.2d at p. 39], quoting *Young, supra*, 427 U.S. at p. 70 [49 L.Ed.2d at p. 326].)

In applying its test to the Renton ordinance, the court found that the first factor was easily satisfied. The court noted that "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.' " (*Renton, supra*, 475 U.S. at p. 50 [89 L.Ed.2d at pp. 39-40], quoting *Young, supra*, 427 U.S. at p. 71 [49 L.Ed.2d at pp. 326-327].)

The court also found "no constitutional defect in the method chosen by Renton to further its substantial interests." (*Renton, supra*, 475 U.S. at p. 52 [89 L.Ed.2d at pp. 40-41].) "Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton." (*Ibid.*) " 'It is not our function to appraise the wisdom of [the city's] decision to require adult theaters to be separated rather than concentrated in the same areas. . . . [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.' " (*Ibid.*, quoting *Young, supra*, 427 U.S. at p. 71 [49 L.Ed.2d at pp. 326-327].) In this connection, the court noted that "the Renton ordinance is 'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary effects . . ." (*Renton, supra*, 475 U.S. at p. 52 [89 L.Ed.2d at pp. 40-41]; see *Simon & Schuster, Inc.* v. *Members of the New York State Crime Victims Bd.* (1991) 502 U.S. ___, fn. ** [116 L.Ed.2d 476, 491, 112 S.Ct. 501, 511], ["[U]nder Ward and Renton . . . regulations must be 'narrowly tailored' to advance the interest asserted by the State."]; *People* v. *Superior Court (Lucero)* (1989) 49 Cal.3d 14, 27 [259 Cal.Rptr. 740, 774 P.2d 769] [Ordinance must be "content-neutral and narrowly tailored to minimize only the adverse secondary effects related to adult entertainment establishments."].)

More recently, in *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781 [105 L.Ed.2d 661, 109 S.Ct. 2746] (*Ward*), the high court has provided further guidance on the "narrowly tailored" requirement. In *Ward*, the court stated that ". . . a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so." (*Id.* at p. 798 [105 L.Ed.2d at pp. 679-680].) "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less

effectively absent the regulation.' " (*Id.* at p. 799 [105 L.Ed.2d at pp. 680-681], quoting *United States* v. *Albertini* (1985) 472 U.S. 675, 689 [86 L.Ed.2d 536, 548, 105 S.Ct. 2897]). The court noted that "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." (*Ward, supra,* 491 U.S. at p. 799 [105 L.Ed.2d at pp. 680-681].) However, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (*Id.* at p. 800 [105 L.Ed.2d at p. 681].) "[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct." (*Id.* at p. 801 [105 L.Ed.2d at pp. 681-682].)

In explicating the second factor, that the ordinance must allow for reasonable alternative avenues of communication, the *Renton* court rejected an economic viability standard for determining whether the zoning ordinance was constitutional. Playtime Theatres claimed that the ordinance was invalid in part because as a practical matter it restricted the availability of locations for adult businesses. Under the *Renton* ordinance, "520 acres, or more than five percent of the entire land area of Renton, [was] open to use as adult theater sites." (*Renton, supra,* 475 U.S. at p. 53 [89 L.Ed.2d at pp. 41-42].) "The District Court found, and the Court of Appeals did not dispute the finding, that the 520 acres of land consist[ed] of '[a]mple, accessible real estate,' including 'acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is crisscrossed by freeways, highways, and roads.' " (*Ibid.*)

Playtime Theatres contended, however, that "some of the land in question [was] already occupied by existing businesses, that 'practically none' of the undeveloped land [was] currently for sale or lease, and that in general there [were] no 'commercially viable' adult theater sites within the 520 acres left open by the Renton ordinance." (*Renton, supra,* 475 U.S. at p. 53 [89 L.Ed.2d at pp. 41-42].) Specifically, "[a] substantial part of the 520 acres [was] occupied by: ¶ (1) a sewage disposal site and treatment plant; ¶ (2) a horseracing track and environs; ¶ (3) a business park containing buildings suitable only for industrial use; ¶ (4) a warehouse and manufacturing facilities; ¶ (5) a Mobil Oil tank farm; and, ¶ (6) a fully-developed shopping center." (*Playtime Theaters, Inc.* v. *City of Renton* (9th Cir. 1984) 748 F.2d 527, 534.) The Ninth Circuit "accepted these arguments, concluded that the 520 acres was not truly 'available' land, and therefore held that the Renton ordinance 'would result in a substantial restriction' on speech." (*Renton, supra,* 475 U.S. at pp. 53-54 [89 L.Ed.2d at pp. 41-42], fn. omitted.)

The Supreme Court held unequivocally to the contrary: "That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have 'the effect of suppressing, or greatly restricting access to, lawful speech,' . . . we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. . . . 'The inquiry for First Amendment purposes is not concerned with economic impact.' . . . In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement." (*Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42], quoting *Young, supra,* 427 U.S. at p. 78 [49 L.Ed.2d at pp. 330-331].)

Thus, the court held that "the Renton ordinance represents a valid governmental response to the 'admittedly serious problems' created by adult theaters." (*Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42], quoting *Young, supra,* 427 U.S. at p. 71 [49 L.Ed.2d at pp. 326-327].) "Renton has not used 'the power to zone as a pretext for suppressing expression,' . . . but rather has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning." (*Ibid.*) "Here, as in [*Young*], the city has enacted a zoning ordinance that meets these goals while also satisfying the dictates of the First Amendment." (*Id.* at pp. 54-55 [89 L.Ed.2d at pp. 42-43].)

B. *Application of the Renton Analysis*

In applying the *Renton* analysis to the ordinance here, we determine as a preliminary matter whether the ordinance is a content-neutral time, place, and manner regulation. If so, we then determine whether the ordinance, and in particular the shopping center exception, is designed to serve a substantial governmental interest, and allows for reasonable alternative avenues of communication.[6]

[6]Respondents attempt to raise in this court several arguments under the California Constitution. Respondents failed to raise these arguments in the Court of Appeal. Accordingly, we do not reach these claims, or decide whether the California Constitution provides greater protection to respondents than the federal Constitution. (Cal. Rules of Court, rule 29.)

In addition, respondents raise in this court arguments regarding a conditional use permit amendment to the ordinance. Once again, however, respondents failed to raise these

## 1. *Content-Neutrality*

■ Since the city's ordinance, like the one in *Renton*, does not ban adult businesses altogether, but merely provides that such businesses may only be located in certain areas, the ordinance is properly analyzed as a form of time, place, and manner regulation. (*Renton, supra,* 475 U.S. at p. 46 [89 L.Ed.2d at pp. 36-37].)

Moreover, we conclude that the ordinance is content-neutral, since the ordinance is, as in *Renton, supra,* 475 U.S. at page 47 [89 L.Ed.2d at pages 37-38], aimed not at the content of materials sold, but rather at the secondary effects of adult businesses on the surrounding community.[7] While the superior court did not expressly address this issue, in its discussion of the evidence in support of its finding that the ordinance was designed to serve a substantial government interest, the court noted that there was testimony that the ordinance "was enacted as part of a comprehensive scheme of urban redevelopment" in an effort to combat blight in National City, and that "the presence of Chuck's Bookstore . . . has led to 'secondary effects' on the community. . ." Moreover, the court's ruling upholding the constitutionality of the ordinance under *Renton* constitutes an implied finding that the ordinance is content-neutral. The record amply supports this implied finding.

■ Respondents devote much of their argument to the proposition that the city's ordinance is content-based, and that the "predominant censorial purpose" behind it was to prohibit the establishment of any adult business. In support of this contention, respondents rely on evidence they claim establishes that the city knew or should have known owners of shopping centers would be either reluctant, or would outright refuse, to rent to an adult business. The factual predicate for this argument is unsupported by the record, since Mr. Post categorically denied that city planners were aware of

arguments in the Court of Appeal, and we therefore decline to consider them here. Moreover, we note that respondents appear to largely rely on the amendment as further evidence of an alleged impermissible government intent, an argument we consider *post* and reject.

[7]We note that the written stated purpose of the ordinance is to "prevent problems of blight and deterioration which accompany and are brought about by the concentration of adult entertainment establishments." However, there was also evidence that under the shopping center exception, adult businesses could be concentrated so long as they were located in a mall. Hence, it appears that the written stated purpose of the ordinance has not been amended to conform with the addition of the shopping center exception, and the purpose underlying that exception. However, we note that respondents have never contended, and in particular did not contend at the trial level, that the written stated purpose of the ordinance failed to support the city's testimony as to the purpose of the shopping center exception, despite the fact that the issue was brought to the parties' attention by the trial judge. Hence, we conclude that both purposes of the ordinance are supported by substantial evidence, and that we may rely on both purposes in determining that the ordinance is content-neutral.

any reluctance to rent.[8] More importantly, Mr. Post denied any motivation on the part of the city to eliminate adult businesses. Rather, Mr. Post testified that the purpose of the ordinance was to alleviate the secondary effects of adult businesses, while allowing reasonable alternative locations for those businesses. The trial court apparently credited this testimony, and we see no reason to question its ruling. (See *Renton, supra*, 475 U.S. at p. 48 [89 L.Ed.2d at p. 38], quoting *United States* v. *O'Brien* (1968) 391 U.S. 367, 383 [20 L.Ed.2d 672, 683-684, 88 P.2d 1673] [" 'It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.' "]; *Ward, supra*, 491 U.S. at p. 791 [105 L.Ed.2d at p. 675], quoting *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 293 [82 L.Ed.2d 221, 226-227, 104 S.Ct. 3065] ["Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.' "].)

Respondents also rely on evidence that they claim demonstrates that the city knew or should have known that it would not be economically feasible for an adult business to build its own shopping center. However, as we discuss more fully in our evaluation of whether the ordinance allows for reasonable alternative avenues of communication, the ordinance does not limit respondents' alternatives to such construction.

Finally, respondents argue that since the effect of the ordinance is to eliminate all adult businesses, that must be its underlying intent. Since we conclude, *post*, that the ordinance does not have this effect, we likewise reject respondents' suggestion of illicit intent.

In sum, we conclude that the ordinance is content-neutral, and proceed to evaluate the constitutionality of the ordinance under *Renton*'s two-part test.

### 2. *Substantial Government Interest*

■ We find, as did the two lower courts, that the first prong of "substantial governmental interest" is easily satisfied. The city presented substantial evidence at trial that adult businesses are a source of urban decay, and that the location of the adult business at issue in this case has in fact led to the secondary effects the ordinance seeks to curtail. Moreover, the city

---

[8]Rather, respondents' evidence in this regard essentially consists of testimony that it is generally known among realtors that shopping centers do not usually rent to adult businesses. Such generalized, speculative evidence, not linked to any city representative, fails to even rise to the level of an illicit "motivating factor." (See *Renton, supra*, 475 U.S. at pp. 47-48 [89 L.Ed.2d at pp. 37-38] [distinguishing generally between an illicit "motivating factor" and a legitimate "predominant purpose"].)

demonstrated that both the distance regulation and the shopping center exception are designed to serve substantial government interests in decreasing blight and crime, shifting part of the regulatory burden to the private sector, by either dispersing adult businesses, or by placing them in locations such as enclosed shopping malls designed to minimize the occurrence of negative secondary effects, and protecting the city's tax base. (See *Renton, supra*, 475 U.S. at p. 48 [89 L.Ed.2d at p. 38] [upholding ordinance "designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life' "].) We also find that the city's shopping mall exception is narrowly tailored, since the " 'regulation promotes . . . substantial government interest[s] that would be achieved less effectively absent the regulation.' " (*Ward, supra*, 491 U.S. at p. 799 [105 L.Ed.2d at pp. 680-681], quoting *United States* v. *Albertini, supra*, 472 U.S. at p. 689 [86 L.Ed.2d at pp. 548-549].)

First, under the ordinance, the malls in which adult businesses are permitted to be established are either inward looking configurations, or those "isolated from direct view from public streets, parks, schools, churches or residentially zoned property." Access is by a pedestrian walkway, not a public street. This configuration reduces the secondary effects associated with adult businesses by segregating such businesses away from residential areas and schools, and placing them in a location where they do not affect the moral climate of the community as a whole. Specifically, it decreases the problems of harassment of neighborhood adults and children, littering of sexually explicit reading material and paraphernalia, loitering, and visual blight from bright colors and explicit signage associated with adult businesses.

Second, placing adult businesses in shopping centers promotes the city's interests by shifting part of the regulatory burden to the private sector. A shopping center has its own signage, paint, and landscaping restrictions. A mall arrangement also addresses such factors as hours of operation, parking, and security. Thus, a shopping center generally exercises a high degree of control over its tenants. This benefits the city, as Mr. Post testified, by removing it from "the enforcement business. We don't have to expend the amount of resources that we typically would if the shopping center itself is doing some of the policing in terms of these various factors."[9]

Finally, there was testimony that the result of reducing the secondary effects of adult businesses, and freeing up public protection resources, is a

---

[9]Moreover, there was testimony that adult businesses are considered "destination retail," i.e., they deal in goods that consumers specifically seek out wherever they are located, and do not require "high visibility" locations. "Destination retail" businesses are such that if they do relocate, their clientele will typically follow.

healthier economic base. As noted above, National City is particularly reliant on its commercial tax base, and hence has a substantial interest in its preservation.

Therefore, placing adult businesses in malls furthers the city's substantial interests in reducing the secondary effects of adult businesses, relieving the city from some of the regulatory burden by shifting it to the private sector, and protecting the commercial tax base.

3. *Reasonable Alternate Avenues of Communication*

We also conclude that the ordinance provides reasonable alternative avenues of communication. The ordinance makes available the entire commercially zoned area of the city, or 572 acres of land, on which to locate an adult business. This area is highly accessible by major freeways and arterials. In addition, the ordinance limits neither the total number of adult businesses that may locate in the city, nor the hours they may operate. Finally, the ordinance does " 'not affect the operation of existing establishments but only the location of new ones.' " (*Young, supra*, 427 U.S. at p. 71, fn. 35 [49 L.Ed.2d at pp. 326-327], citation omitted.)

Respondents contend, however, that the availability of sites under the ordinance is "illusory" because of the lack of sites currently for rent, the unwillingness of owners of available sites to rent to them, and the considerable cost of building their own shopping center in compliance with the ordinance. We find none of these arguments establish constitutional infirmity.

The high court in *Renton* made clear that " 'The inquiry for First Amendment purposes is not concerned with economic impact.' " (*Renton, supra*, 475 U.S. at p. 54 [89 L.Ed.2d at p. 42], quoting *Young, supra*, 427 U.S. at p. 78 [49 L.Ed.2d at pp. 330-331]. See *City of Vallejo* v. *Adult Books* (1985) 167 Cal.App.3d 1169, 1180 [213 Cal.Rptr. 143] ["[E]vidence of the considerable economic difficulty of locating 'adult' uses at many legally permissible sites within the City of Vallejo . . . . falls far short of establishing that appellant is foreclosed or unreasonably restricted by the ordinance from effectively operating within the city limits."], cert. den. (1986) 475 U.S. 1064 [89 L.Ed.2d 601, 106 S.Ct. 1374].) As noted earlier, *Renton* refused to sustain an economic viability argument on a record demonstrating that a substantial part of the 520 acres zoned for adult businesses was occupied by a sewage disposal site, race track, and other uses restricting, as a practical matter, available sites. Similarly, we decline to find on this record that National

City's ordinance fails to provide reasonable alternative avenues of communication.[10]

Moreover, *Renton* explicitly rejected the argument that because " 'practically none' of the undeveloped land [was] currently for sale or lease" the ordinance " 'would result in a substantial restriction' on speech." (*Renton, supra,* 475 U.S. at pp. 53-54 [89 L.Ed.2d at pp. 41-42], citations omitted.) The record here in fact reveals that vacancies existed at all three shopping centers, and that the evidence of landowners' unwillingness to rent consisted essentially of generalized responses by leasing agents to respondents' expert's telephone inquiry, and testimony that it is generally known among realtors that shopping centers do not usually rent to adult businesses. Nor, in this case, is any reluctance or outright refusal of private land owners to rent to adult businesses dispositive of the issue of whether the ordinance provides a reasonable opportunity for such businesses to locate within National City. While a city may not suppress protected speech, neither is it compelled to act as a broker or leasing agent for those engaged in the sale of it. We decline to hold local governments responsible for the business decisions of private individuals who act for their own economic concerns without any reference to the First Amendment. The Constitution does not saddle municipalities with the task of ensuring either the popularity or economic success of adult businesses.

Respondents' reliance on the fact that only one other adult business currently operates within the city is also misplaced. The number of adult businesses is, without more, of no particular significance in evaluating the validity of the ordinance. We find no authority that mandates a constitutional ratio of adult businesses to a particular population figure.[11] We note that at the time the *Renton* ordinance was enacted "no adult theaters were located in

[10]Respondents assert that if we uphold this ordinance, we approve in advance any and all economic restrictions on adult businesses in violation of *Renton*. While it is conceivable that a zoning ordinance could mandate economic restrictions so severe as to amount to an outright prohibition of First Amendment speech, that is not the case here.

[11]We also reject the analysis suggested by the City of San Diego, and the 36 cities joining in its amicus curiae brief, that we look to the availability of adult materials in surrounding communities in determining whether the National City ordinance provides reasonable alternative avenues of communication. In general, " '[o]ne is not to have the exercise of his [or her] liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " (*Schad* v. *Borough of Mount Ephraim* (1981) 452 U.S. 61, 76-77 [68 Cal.Rptr. 671, 685-686, 101 S.Ct. 2176], quoting *Schneider* v. *State* (1939) 308 U.S. 147, 163 [84 L.Ed.2d 155, 165-166, 60 S.Ct. 146].) Moreover, respondents have filed a motion to strike the factual material filed in support of San Diego's argument, as well as certain factual material attached to the Western Center for Law and Religious Freedom et al.'s amicus curiae brief. We share respondents' concern that none of this material was introduced below, and hence has not been subjected to the rigors of the adversarial process. Accordingly, we have not considered this material in reaching our decision. (See *Bily* v. *Arthur Young & Company*

Renton . . . ." (*Playtime Theaters, Inc.* v. *City of Renton, supra,* 748 F.2d at p. 530.) Moreover, nothing in this record indicates whether similar enterprises have attempted to locate in the city and have been thwarted by virtue of unreasonable restrictions, or simply found it economically less advantageous than other localities.

It is also inaccurate to characterize the ordinance as forcing respondents to build their own shopping mall at prohibitive cost. Rather, this is merely one option under the ordinance. The city has demonstrated that there are three shopping centers, and a partially developed 4.5-acre area, where an adult business may seek to rent an existing location. Moreover, certain malls may be modified in conformance with the ordinance to accommodate adult businesses. It is respondents, not the city, who define construction of a new shopping center as their only alternative under the ordinance. Hence, we conclude that the ordinance provides reasonable alternative avenues of communication.

CONCLUSION

We hold that National City's ordinance is constitutional under the First Amendment. Accordingly, the judgment of the Court of Appeal is reversed, and the matter remanded with instructions to reinstate the trial court's judgment.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**BAXTER, J.**—I concur fully in the reasoning and judgment of the majority. I do so because the evidence does not support a conclusion that no bookstore handling "adult" materials would be able to rent space in National City. No evidence was offered that would support a conclusion that a bookstore which is clean, is well maintained and supervised, and which expects both staff and customers to abide by the law and socially acceptable norms of public conduct would be unable to rent space in a mall in National City.

While I also agree with Justice Mosk that the evidence in this case would support a judgment that Chuck's Bookstore was a common law public nuisance, the trial court did not make such a finding. In its statement of decision, the court expressly noted that the decision would focus on the city's claim that defendant's operation violated the municipal code. This confirms that the trial court judgment rested solely on the theory of statutory public nuisance. This court may not affirm the judgment on a theory that a

(1992) 3 Cal.4th 370, 405, fn. 14 [11 Cal.Rptr.2d 51, 834 P.2d 745] [court may choose to ignore improper material filed in appellate brief rather than strike it from the file].)

common law public nuisance was established. The rule which requires that a reviewing court sustain a judgment if the result is correct even if the trial court based its decision on an erroneous legal theory, has no application here.

*International etc. Workers* v. *Landowitz* (1942) 20 Cal.2d 418 [126 P.2d 609], on which Justice Mosk relies, was an action in which plaintiffs sought an injunction against future violations of a local ordinance. The trial court sustained a demurrer on the ground that the statute was constitutionally invalid. This court disagreed but nonetheless affirmed the judgment of dismissal because subsequent to the entry of judgment the enabling legislation which authorized adoption of the local ordinance had been repealed. There being no other basis for the action, we applied the rule of *Sewell* v. *Johnson* (1913) 165 Cal. 762, 769 [134 P. 704]: "[W]here matters of which the court has judicial knowledge occur subsequent to the trial court's action and have the effect of destroying the basis for the plaintiff's cause of action, it has been held that the appellate court may dispose of the case upon those grounds." (*International etc. Workers* v. *Landowitz, supra,* 20 Cal.2d at p. 423.)

The rule that an appellate court will affirm a correct judgment even if the trial court's reasoning was faulty was adopted by this court in *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329-330 [48 P. 117]: "The fact that the action of the [trial] court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion. [¶] . . . [¶] In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter."

This rule may not be used to uphold a judgment granting relief on the basis of only one of two or more counts pleaded in the complaint, each of which counts asserts a different basis for relief.

"Exceptions exist to the rule of nonreviewability of a trial court's reasons for its decision. The exception . . . most germane to this appeal allows for reversal where the trial court has refused to pass on an issue and disposes of the case on an entirely different ground. If the trial court thus chose an

improper ground, an appellate court will not uphold the judgment on the ground *not* addressed by the trial court, *if* resolution of that issue depends upon conflicting evidence." (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933, fn. 9 [266 Cal.Rptr. 231], italics in original. See also, *Zak* v. *State Farm etc. Ins. Co.* (1965) 232 Cal.App.2d 500, 506 [42 Cal.Rptr. 908]; *Kyne* v. *Kyne* (1943) 60 Cal.App.2d 326, 332 [140 P.2d 886]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 262, p. 269.)

The trial court in this case did make factual findings that might also support a conclusion that Chuck's Bookstore was a common law public nuisance. It did so only insofar as that evidence was relevant to determining that the bookstore had undesirable "secondary" effects, however. The court did not make the findings necessary to resolve whether Chuck's Bookstore was, at the time the action was brought, a common law public nuisance.[1] It would not be appropriate, therefore, to uphold the judgment on the basis suggested by Justice Mosk.

**MOSK, J.,** Concurring and Dissenting.—There are nine words in the majority opinion with which I agree: "the judgment of the Court of Appeal is reversed." However, because the bulk of the opinion proposes to give effect to a city ordinance that unconstitutionally bans the dissemination of First Amendment-protected material, I must distance myself from its reasoning.

First, the facts.

At the time of trial, Chuck's Bookstore was the only adult bookstore in National City—a city of more than 57,000—although there is one other sexually oriented business, a movie theater.

Purporting to rid itself of urban blight, the city enacted an ordinance prohibiting sexually oriented businesses like Chuck's from locating within 1,500 feet of each other, 1,500 feet of a school or park, or 1,000 feet of a residential zone. Strip development dominates the city's commercial zones; therefore, as the city conceded at trial, the distance rules are an effective ban

---

[1]Two of the three witnesses who testified regarding the activities and conditions described in footnote 4 of the majority opinion, *ante,* made their observations a year or more prior to trial. Both acknowledged that prior to trial changes had been made in the interior of the bookstore. Subsequent to their observations a fence had been constructed to separate the rear alleyway from the rear yard of the home directly behind the bookstore. Therefore, although their testimony was uncontradicted, it was not adequate to establish that either the bookstore employees or the patrons currently engaged in the objectionable conduct. The third witness, who lived behind the bookstore, testified that she continued to be bothered by patrons even after the fence was constructed and that her neighbors were also bothered. Her testimony did not establish a common law nuisance as a matter of law, however.

on places like Chuck's. But the law also provides that Chuck's may operate in any commercial zone, regardless of the aforementioned distance requirements, as long as it is in an enclosed mall or an unenclosed mall in which it faces inward so as to be invisible from the street.

The city sought abatement of Chuck's as a common law and statutory public nuisance. The common law claim rested on an allegation that Chuck's was pestiferous to its neighbors. The basis for the statutory claim was that Chuck's violated a National City ordinance: it was too close to residences and the adult theater, and it did not come within any exception to the distance rules because it was not in an enclosed or inward-facing mall.

It was uncontested that Chuck's enjoys First Amendment protection and therefore the city must provide reasonable alternative avenues of communication, as constitutionally required.[1] But much of the city's case focused on its allegation that Chuck's was a common law public nuisance. It is to this theory that I turn first.

I

The city could properly seek to have the bookstore abated as a common law public nuisance. (Civ. Code, § 3491, subd. 3; Code Civ. Proc., § 731.) The city alleged, and provided strong evidence at trial, that Chuck's is a classic public nuisance. (Civ. Code, §§ 3479, 3480.) The store had front and rear entrances. The management would leave the rear door open, evidently without proper supervision, and patrons would wander between Chuck's and the back alley, which ineffectually separated the store from a historically distinguished row of residences. Chuck's patrons would, among other activities, have sex in the bushes, wander into neighboring residents' backyards, bother the neighbors with unsavory requests, and discard condoms and pornographic material on or near neighbors' residential property. Store workers would slop buckets of pungent cleaning fluid into the back alley.[2] The record leaves no doubt whatever that defendant did not manage the property properly.

---

[1]The First Amendment does not prevent the state from suppressing obscenity (*Roth* v. *United States* (1957) 354 U.S. 476, 485 [1 L.Ed.2d 1498, 1507, 77 S.Ct. 1304]), but there was no contention in this case that Chuck's was selling obscene material.

[2]Also see the portion of footnote 4 of the majority opinion describing neighbors' injuries. It is important to note, however, that the references in that footnote to indoor conduct, distasteful as that conduct might be to most people, do not describe a nuisance, for the actionable injury presumably would be neither to others on their own property nor to the possessor of the indoor premises. (See *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1133-1137 [281 Cal.Rptr. 827].)

The common law of nuisance has been codified in our Civil Code. Thus it has a statutory basis. Nevertheless, I shall continue to refer to the first cause of action as one for common law nuisance, to distinguish it from the second cause of action under the National City ordinance, which is also statutory.

Thus there was ample evidence to sustain the trial court's judgment that the bookstore was a public nuisance. The judgment did not specify, however, whether Chuck's was a statutory or a common law nuisance, and the statement of decision discussed only the statutory claim. Perhaps for this reason, the Court of Appeal focused on the constitutionally infirm statutory claim, rather than the strong evidence that Chuck's was a common law public nuisance.[3]

Assuming arguendo that the trial court's judgment declaring Chuck's a public nuisance was rendered on the constitutionally infirm statutory ground, rather than on the sound basis of the Civil Code, nevertheless the trial court's decision was correct because there was sufficient evidence of a common law public nuisance to support it. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) The judgment should therefore have been sustained, for a reviewing court must sustain a judgment if the result was correct, no matter that the trial court gave the wrong legal reason for its decision. (*International etc. Workers* v. *Landowitz* (1942) 20 Cal.2d 418, 423 [126 P.2d 609] [even if court erred in its analysis of ordinance's constitutionality, judgment must be sustained because it was correct on other grounds].) Therefore the majority opinion is correct that the Court of Appeal's judgment must be reversed.

Alas, in their eagerness to comment on the constitutionality of the ordinance—in actuality not at issue—the majority ignore the common law nuisance claim. Thus in my view their discussion becomes purely advisory.

It is axiomatic that we may not address constitutional questions when there is another ground on which to reach a decision. Such is the rule we have previously imposed on ourselves. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 233 [149 Cal.Rptr. 239, 583 P.2d 1281] [stating general rule]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].) It is also part of the self-discipline of the United States Supreme Court, which calls it a " 'fundamental rule of judicial restraint.' " (*Jean* v. *Nelson* (1985) 472 U.S. 846, 854 [86 L.Ed.2d 664, 670-671, 105 S.Ct. 2992].) The federal high court has

---

[3]The bookstore's First Amendment-protected status does not shield it from California's common law public nuisance laws. (*Arcara* v. *Cloud Books, Inc.* (1986) 478 U.S. 697, 707 [92 L.Ed.2d 568, 578, 106 S.Ct. 3172] [plur. opn.]; accord, *id.* at p. 708 [92 L.Ed.2d at pp. 578-579] [conc. opn. of O'Connor, J.]; see also *Grayned* v. *City of Rockford* (1972) 408 U.S. 104 [33 L.Ed.2d 222, 92 S.Ct. 2294]; *cf. People* ex rel. *Arcara* v. *Cloud Books, Inc.* (1986) 68 N.Y.2d 553 [510 N.Y.S.2d 844] [closing bookstore as nuisance impermissibly burdened freedom of expression under New York Constitution if lesser sanctions would end nuisance]; but see fn. 12, *post.*)

commanded all federal courts to follow the rule. (*Ibid.*) And it is a principle of decisionmaking to which the appellate courts of every other state in the United States subscribe.[4] Finally, a restrained view of a reviewing court's role would ascribe no importance to a party's desire to resolve the case on constitutional grounds or lower courts' failure to address the common law claim. (See *United States* v. *Locke* (1985) 471 U.S. 84, 92 [85 L.Ed.2d 64, 74, 105 S.Ct. 1785]; *United States* v. *C.I.O.* (1948) 335 U.S. 106, 110 [92 L.Ed.2d 1849, 1855, 685 S.Ct. 1349]; *Troy State University* v. *Dickey* (5th Cir. 1968) 402 F.2d 515, 516.)

The constitutional discussion is not necessary to reach the result that the Court of Appeal's judgment must be reversed. It therefore may be deemed a

---

[4](*Love* v. *Fulford* (Ala. 1983) 442 So.2d 29, 33; *Perry* v. *State* (Alaska 1967) 429 P.2d 249, 252; *State* v. *Church* (1973) 109 Ariz. 39 [504 P.2d 940, 942] [usual rule]; *Bell* v. *Bell* (1971) 249 Ark. 959 [462 S.W.2d 837, 840]; *Lipset* v. *Davis* (1949) 119 Colo. 335 [203 P.2d 730, 731]; *City of Hartford* v. *Powers* (1981) 183 Conn. 76 [438 A.2d 824, 828]; *Agostini* v. *Colonial Trust Co.* (1945) 28 Del.Ch. 360 [44 A.2d 21, 22, fn. 1]; *State* v. *Tsavaris* (Fla. 1981) 394 So.2d 418, 421-422; *Farmer* v. *State* (1971) 228 Ga. 225 [184 S.E.2d 647, 648]; *Doe* v. *Roe* (1984) 67 Hawaii 63 [677 P.2d 468, 471]; *Poesy* v. *Bunney* (1977) 98 Idaho 258 [561 P.2d 400, 406]; *Haughton* v. *Haughton* (1979) 76 Ill.2d 439 [394 N.E.2d 385, 389]; *Board of Com'rs* v. *Kokomo City Plan Com'n* (1975) 263 Ind. 282 [330 N.E.2d 92, 96]; *In Interest of Chad* (Iowa 1982) 318 N.W.2d 213, 216, fn. 2; *State* ex rel. *Fatzer* v. *Barnes* (1951) 171 Kan. 491 [233 P.2d 724, 726]; *Preston* v. *Clements* (Ct.App. 1950) 313 Ky. 479 [232 S.W.2d 85, 88]; *Benson & Gold Chev.* v. *La. Motor Veh. Com'n* (La. 1981) 403 So.2d 13, 23; *State* v. *Bassford* (Me. 1982) 440 A.2d 1059, 1061; *Com'r of Labor and Industry* v. *Fitzwater* (Ct.App. 1977) 280 Md. 14 [371 A.2d 137, 140]; *Com.* v. *Loretta* (1982) 386 Mass. 794 [438 N.E.2d 56, 59]; *Snyder* v. *Charlotte P. School Dist., Eaton Cty.* (1984) 421 Mich. 517 [365 N.W.2d 151, 158]; *Complaint Concerning Winton* (Minn. 1984) 350 N.W.2d 337, 343, fn. 9; *Kron* v. *Van Cleave* (Miss. 1976) 339 So.2d 559, 563; *State* ex rel. *Union Elec.* v. *Pub. Serv. Com'n* (Mo. 1985) 687 S.W.2d 162, 165 & fn. 4; *Board of Com'rs of Flathead County* v. *Eleventh Judicial Dist. Court* (1979) 182 Mont. 493 [597 P.2d 728, 731]; *State, Department of Motor Vehicles* v. *Lessert* (1972) 188 Neb. 243 [196 N.W.2d 166, 169]; *Spears* v. *Spears* (1979) 95 Nev. 416 [596 P.2d 210, 212]; *State* v. *Hodgkiss* (1989) 132 N.H. 376 [565 A.2d 1059, 1061]; *Donadio* v. *Cunningham* (1971) 58 N.J. 309 [277 A.2d 375, 384]; *Property Tax Dept.* v. *Molycorp., Inc.* (1976) 89 N.M. 603 [555 P.2d 903, 905-906]; *Peters* v. *New York City Housing Authority* (1954) 307 N.Y. 519 [121 N.E.2d 529, 531]; *Williams* v. *Williams* (1980) 299 N.C. 174 [261 S.E.2d 849, 859]; *Murie* v. *Cavalier County* (1938) 68 N.D. 242 [278 N.W. 243, 246]; *Greenhills Home Own. Corp.* v. *Village of Greenhills* (1966) 5 Ohio St.2d 207 [215 N.E.2d 403, 407]; *Schwartz* v. *Diehl* (Okla. 1977) 568 P.2d 280, 283; *State* v. *House* (1985) 299 Ore. 78 [698 P.2d 951, 952]; *Ballou* v. *State Ethics Commission* (1981) 496 Pa. 127 [436 A.2d 186, 187 & fn. 2]; *Town of Barrington* v. *Blake* (R.I. 1987) 532 A.2d 955; *Floyd* v. *Thornton* (1951) 220 S.C. 414 [68 S.E.2d 334, 339] [general rule]; *State* v. *Big Head* (S.D. 1985) 363 N.W.2d 556, 559; *Watts* v. *Memphis Transit Management Co.* (1971) 224 Tenn. 721 [462 S.W.2d 495, 498]; *Courtney* v. *State* (Tex.Ct.App. 1982) 639 S.W.2d 16, 17; *Goodsel* v. *Department of Business Regulation* (Utah 1974) 523 P.2d 1230, 1232; *Watkins* v. *Ford* (1918) 123 Va. 268 [96 S.E. 193, 194]; *State* v. *Clarke* (1985) 145 Vt. 547 [496 A.2d 164, 167]; *Tommy P.* v. *Board of County Com'rs* (1982) 97 Wn.2d 385 [645 P.2d 697, 700]; *Priester* v. *Hawkins* (1981) 168 W.Va. 569 [285 S.E.2d 396, 398]; *Labor & Farm Party* v. *Elections Bd. of Wis.* (1984) 117 Wis.2d 351 [344 N.W.2d 177, 179]; *Stambaugh* v. *State* (Wyo. 1977) 566 P.2d 993, 996.)

dictum, unnecessary to the judgment. (*Bakke* v. *St. Thomas Public Sch. Dist. No. 43* (N.D. 1984) 359 N.W.2d 117, 120.)

## II

As indicated above, the constitutional issue should be of no precedential importance. But because the majority opinion contains a gratuitous commentary on the constitutionality of the National City ordinance, I offer my own views on the subject.

The record establishes conclusively that as applied to a sexually oriented business the National City ordinance cannot pass constitutional muster.

*City of Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41 [89 L.Ed.2d 29, 106 S.Ct. 925] (*Renton*), the leading case in this area,[5] held that an ordinance that regulates sexually oriented but First Amendment-protected establishments must provide for alternative avenues of communication, and that these avenues must be reasonable. (*Id.* at p. 50 [89 L.Ed.2d at pp. 39-40].) Moreover, the burden lies with the government to show that the reasonable alternatives exist. (*Ibid.*; see also *Playtime Theaters, Inc.* v. *City of Renton* (9th Cir. 1984) 748 F.2d 527, 538.) Though *Renton* upheld that city's dispersal ordinance, it made clear, in line with its general statement at page 50 of 475 U.S. [89 L.Ed.2d at pages 39-40], that the First Amendment requires a city to "refrain from effectively denying . . . a *reasonable* opportunity to open and operate an adult theater within the city . . . ." (*Id.* at p. 54 [89 L.Ed.2d at p. 42], italics added.)

With these principles in mind, let us examine in greater detail the facts of this case as revealed at trial.

The city's planning director testified that the distance requirements, taken by themselves, imposed a de facto ban, denying any opportunity—much less a reasonable one—for Chuck's to operate in National City. Because such a ban is patently unconstitutional, the city also purported to give sexually oriented businesses the opportunity to locate in an unobtrusive mall location. But as the record reveals, the city's exception is meaningless—the opportunity it provides is purely chimerical.

---

[5]The majority opinion refers both to *Renton* and to *Young* v. *American Mini Theatres, Inc.* (1976) 427 U.S. 50 [49 L.Ed.2d 310, 96 S.Ct. 2440] as landmark cases. But *Young* was a plurality opinion, and the high court recently disparaged it. (*R.A.V.* v. *City of St. Paul* (1992) 505 U.S. __, __ [120 L.Ed.2d 305, 322, 112 S.Ct. 2538].) Also, in diametrical contrast to this case, *Young* considered a dispersal ordinance that left many locations available. (427 U.S. at pp. 71-72, fn. 35 [49 L.Ed.2d at p. 327].) For these reasons, I shall concentrate on *Renton* as the significant United States Supreme Court authority.

The record discloses that there were only three existing locations that could fulfill the mall requirements: the Plaza Bonita, Sweetwater Town & Country, and South Bay Plaza shopping centers. A witness for defendant, Tony Solis, testified that none of the three shopping centers would lease to an adult bookstore. At South Bay Plaza the leasing agent told him that the center would not rent to a business like Chuck's. At Town & Country he found out from realtors that an existing lease to Circuit City specified either that Circuit City was forbidden to sublet to an adult bookstore or that the mall was forbidden to lease any space to such a business. At the third and final possible location, Plaza Bonita, the character of the mall was apparently sufficiently genteel that Solis did not even inquire about the possibility of entering into a lease, but merely surveyed the site and took photographs of existing businesses.

In sum, no existing site was available to Chuck's, a fact that led to the trial court's somewhat rhetorical remark to counsel, "Is there any question in your mind that not in a million years would Plaza Bonita, or T&C, or South Bay Plaza rent to Mr. Wiener [defendant] . . . ?"[6]

The unavailability of the city's entire commercial area, including the three enclosed malls, left only the possibility of new construction that would fulfill the city's concealment requirements. In that regard, defendant's expert witness Clifford Beck—a redevelopment consultant with 40 years' construction experience in shopping centers and an expert in mall development—testified it would cost $6.5 million to build a small inward-facing mall that would meet the requirements.[7] More significant yet was Beck's uncontradicted testimony that in National City it would require two to five years

[6]At times the witnesses seemed bemused or incredulous at the kinds of questions they were being asked, because the shopping centers' unwillingness to rent to an adult bookstore seemed self-evident to them. Solis testified:

"Q. In your experience in the commercial real estate business, is it expected that retail shopping centers such as the ones I've mentioned would not rent to adult entertainment businesses?

"A. That's correct. They ordinarily wouldn't rent.

"Q. Would not rent?

"A. Would not rent to an adult bookstore.

"Q. And is that generally known by people who are in the commercial real estate business?

"A. Well, if you don't know it, you'll soon find out."

[7]The majority opinion indirectly acknowledges this testimony, but then states that "no direct evidence was presented regarding the economic viability of such an enterprise, or the ability of respondents to undertake such development." (Maj. opn., *ante*, p. 838.) This conclusion implies that the burden lies on the bookseller, not the city, to show that the ordinance does not offend the First Amendment. The law, however, is otherwise. (*Morscott, Inc.* v. *City of Cleveland* (N.D. Ohio 1990) 781 F.Supp. 500, 503; *World Wide Video* v. *City of Tukwila* (1991) 117 Wn.2d 382, 389-390 [816 P.2d 18, 21]; see also *Renton, supra*, 475 U.S. at p. 50 [89 L.Ed.2d at p. 39].)

merely to assemble the property—from thirty different landowners—and financing needed to build the most uncomplicated and minimally sized mall that would meet the city's rules.

In sum, defendant proved that the city had effectively denied him "a reasonable opportunity to open and operate an adult [business] . . . ." (*Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42].)[8] To reach any other conclusion is to ignore commercial reality as well as the First Amendment's command. "There can be no doubt that bookselling is a constitutionally protected activity or that closing a bookstore for a year may have a substantial impact on that activity." (*People* ex rel. *Arcara* v. *Cloud Books, Inc., supra,* 68 N.Y.2d 553, 558 [510 N.Y.S.2d 844, 847] [interpreting New York Constitution].)

Relying on *Renton, supra,* 475 U.S. 41, the majority opinion implies that defendant's inability to locate his business anywhere in National City does not violate the First Amendment because the only impediments to doing so are economic. (Maj. opn., *ante,* p. 848 ["The Constitution does not saddle municipalities with the task of ensuring either the popularity or economic success of adult businesses."].) That statement betrays a fundamental misunderstanding of *Renton*'s teaching.

The Ninth Circuit explained that the Renton ordinance set aside 520 acres on which an adult bookstore could be located, but noted that the district court had found that "a substantial part" of the 520 acres was occupied by existing businesses or industrial facilities not easily adapted—if adaptable at all—to an adult bookstore. (*Playtime Theaters, Inc.* v. *City of Renton, supra,* 748 F.2d 527, 534.) The high court rejected the Ninth Circuit's view that these impediments amounted to a substantial restriction on speech. The court stated: "That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. . . . [W]e have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites *at bargain prices.*" (*Renton, supra,* 475 U.S. at p. 54 [89 L.Ed.2d at p. 42], italics added.)

But the Renton ordinance did not limit the location of adult bookstores to specific physical facilities, as does the ordinance at bench: it merely specified certain distance requirements. (*Renton, supra,* 475 U.S. at p. 43 [89

---

[8]There was one other possibility for relocation: the addition, to an existing strip mall of the type ubiquitous in southern California, of an inward-facing adult bookstore. Ironically, the city established through defendant's witness Beck that this too was impossible: the loss of parking space would make the entire mall uneconomical and might violate zoning laws, and the existing tenants would "beef like mad" about the obstruction of their all-important exposure to the street. In sum, such a modification would not be feasible.

L.Ed.2d at p. 35]; see also *Playtime Theaters, Inc.* v. *City of Renton, supra,* 748 F.2d at pp. 529-530.) Within the 520 acres not occupied by the incompatible existing facilities, an adult bookstore owner was free to build or buy a small mom-and-pop store, for example, and there operate the book business. Renton's ordinance, in sum, provided for " '[a]mple, accessible real estate.' " (475 U.S. at p. 53 [89 L.Ed.2d at p. 41].) The United States Supreme Court was declaring only that the city need not locate economically advantageous sites for an adult bookstore, any more than it need do so for a Shakespearean festival, an art museum, a symphony hall, or a repertory movie theater.

That is not the situation before us. The city conceded the distance rules ban adult bookstores. The record reveals the alternatives to be purely illusory. Alas, those facts do not appear to perturb the majority. If the law's majestic equality can forbid rich and poor alike to sleep under bridges,[9] then apparently in the majority's view the law may with equally lofty impartiality permit an adult bookstore to locate anywhere available to Saks Fifth Avenue. *Renton,* however, does not countenance such prohibitions disguised as mere restrictions: immediately after the statement that the law does not require cities to guarantee sites at bargain prices, the court held that a city must "refrain from effectively denying . . . a *reasonable* opportunity to open and operate an adult theater within the city . . . ." (475 U.S. at p. 54 [89 L.Ed.2d at p. 42], italics added)—an opportunity to obtain " '[a]mple, accessible real estate' " (*Id.* at p. 53 [89 L.Ed.2d at p. 41], italics added).[10]

The complete cynicism of National City's ordinance is easily exposed. For the ordinance permits adult bookstores to locate precisely where the values the ordinance is ostensibly designed to protect—what the majority opinion refers to as "the moral climate of the community as a whole" (maj. opn., *ante,* p. 846)—are entirely vulnerable. A family-oriented shopping mall,

---

[9]Anatole France, Le Lys Rouge (as printed by Calmann-Lévy, Editeurs (1918)), chapter 7, page 118.

[10]See also *Walnut Properties, Inc.* v. *City of Whittier* (1988) 861 F.2d 1102, in which the Ninth Circuit held unconstitutional a city ordinance that was more generous than is National City's in that it would at least allow a handful of adult businesses to operate (see particularly pp. 1107-1109). The court concluded, "To hold . . . that there are adequate alternatives available for expression of this sort would make a mockery of First Amendment protections and would render meaningless the Supreme Court's admonition that an ordinance must not 'effectively den[y] . . . a reasonable opportunity to open and operate an adult theater within the city.' *Renton,* 475 U.S. at 53-54 [89 L.Ed.2d at pp. 41-42], 106 S.Ct. at 932." (*Id.* at p. 1109.)

This court's recent decision in *People* v. *Superior Court (Lucero)* (1989) 49 Cal.3d 14 [259 Cal.Rptr. 740, 774 P.2d 769, A.L.R.5th 3346] adds nothing to the majority's constitutional surmises. The opinion only briefly alludes to the economic-impact discussion in *Renton* and does not contravene my discussion of that issue here. (See 49 Cal.3d at p. 25, fn. 6.)

with small children wandering about and adolescents congregating after school, would seem to be the last place the city would prefer an adult bookstore to locate, even if city officials truly believed the mall owner would permit it.

In conclusion, the record shows National City's ordinance to be in effect a complete proscription of First Amendment-protected adult businesses. The bookstore cannot locate anywhere now, and it would take several years for its owners to be able to build an entire commercial mall, assuming it is feasible and they can afford to do so. Therefore, under the First Amendment as interpreted in *Renton*, the ordinance cannot stand.[11]

### III

National City is said to be a venerable municipality more than 100 years old. No doubt. I must add that the First Amendment is also venerable, it being the foundation of a free society. (See generally my concurring and dissenting opinion in *People* v. *Superior Court (Lucero)*, *supra*, 49 Cal.3d at pp. 28-34.)

The judgment of the Court of Appeal should be reversed on the basis of common law public nuisance.[12] The balance of the majority opinion cannot be supported.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied January 21, 1993, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[11]Justice Baxter's own reference to the third witness's testimony in footnote 1 of his concurring opinion, *ante*, makes unpersuasive his statement that the neighbors did not establish an abatable common law nuisance as a matter of law. But if he is correct on this point, then *Renton*, *supra*, 475 U.S. 41, applies squarely; and without state law complications there can be no obstacle to the United States Supreme Court hearing the case and correcting the majority opinion's faulty constitutional reasoning.

Moreover, I find irrelevant Justice Baxter's statement that there was no evidence a clean, well-maintained bookstore would be unable to acquire space in a mall. He fails to consider that the burden is on the city to show that reasonable alternative avenues of communication exist. The city offered no evidence that a mall would lease space to an adult bookstore.

[12]In stating that the Court of Appeal's judgment must be reversed, I do not mean to sanction the use of the Civil Code's restatement of the common law of nuisance as a pretext for ridding a community of First Amendment-protected activity. The federal high court has also cautioned that it would take a dim view of any such action. (*Arcara* v. *Cloud Books, Inc.*, *supra*, 478 U.S. 697, 707, fn. 4 [92 L.Ed.2d 568, 578]; accord, *id.* at p. 708 [92 L.Ed.2d at pp. 578-579] [conc. opn. of O'Connor, J.].) There is no such risk here, however: Chuck's was proven to be a common law public nuisance and the city's action was not pretextual in that regard.