Filed 3/26/13  In re Abraham M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ABRAHAM M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | F063325 |
| Plaintiff and Respondent, | (Super. Ct. No. JJD064979) |
| v. | |
| ABRAHAM M., | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Gallo, Judge.

Nuttall & Coleman, Roger T. Nuttall and Glenn M. Kottcamp for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Abraham M. was committed to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ), after it was found true that he had committed willful, deliberate and premeditated attempted murder (count 1); assault with a deadly weapon (count 2); assault by means likely to produce great bodily injury (count 3); robbery (counts 4 and 5); burglary (count 6); and conspiracy (count 7). In addition, it was found true that Abraham used a deadly weapon, a knife, and inflicted great bodily injury.

He challenges the sufficiency of the evidence to support the counts 1, 3, 4, and 5 offenses. Additionally, he challenges the admission into evidence of text messages between himself and his coconspirator. Abraham also contends the weapons enhancements appended to counts 1, 2, 3, 4, 5, and 6 should be stricken based on Penal Code[1] section 654. Finally, he challenges his commitment to the DJJ.

The People concede section 12022, subdivision (b) enhancements cannot be appended to counts 2 and 3, which set forth violations of section 245, subdivision (a), and must be stricken. The People also concede the remaining section 12022, subdivision (b) enhancements must be stayed. The juvenile court stayed the terms of commitment for all counts except count 1, and all enhancements, except those appended to count 1.

We will reverse the true findings on the section 12022, subdivision (b) enhancements appended to counts 2 and 3 and order the use enhancement appended to count 1 stayed pursuant to section 654. We reject Abraham's other challenges.

**FACTUAL AND PROCEDURAL SUMMARY**

On September 21, 2010, then 15-year-old Abraham and his friend, Frank V., conspired to break into a home in Tulare County. They selected a home at random and forced their way into the backyard. The two young men removed several screens from the windows of the home and Abraham attempted to open the windows with a knife.

---

[1]References to code sections are to the Penal Code unless otherwise specified.

When he was unsuccessful at opening a window with his knife, Abraham picked up a stepping stone he found in the yard and threw it through the glass portion of a door to the house. Abraham and Frank entered the house through the broken glass door and began ransacking the home.

While the two were gathering valuables from inside the home, Gregory Medina, the homeowner, and his 12-year-old son Ryan returned home. As Medina entered the house, he heard their dog barking erratically, saw a light on in his son's room, and heard noise coming from the back of the house. Medina began walking toward his son's room at the back of the house; before he reached the bedroom, Frank stepped into the hallway. Medina and Frank began fighting. Medina managed to get Frank in a choke hold. Abraham then rushed at Medina and punched him in the eye, causing Medina to release his hold on Frank.

Medina had not known there was a second intruder in the house. He continued to fight with Frank, though, and the fight progressed down the hallway. Medina noticed his son was covered in blood "head to toe." Medina stopped fighting with Frank and went to his son. Medina called 911 from the master bedroom.

Medina had been unaware that the second intruder was fighting with his son while he fought with Frank. Abraham had used the knife to stab and slash Ryan, leaving wounds to the boy's head, arms, and stomach. Ryan required numerous stitches to close his wounds and was left with significant scarring. Medina required surgery on his eye to repair injury from the blow leveled by Abraham.

While Medina was tending to Ryan and calling 911, Abraham and Frank fled the scene. Abraham ran to a neighbor's house, attempted to hide in the garage, and told the homeowners "some guys beat him up" and "[j]umped him." Abraham asked to be taken to the middle school. The homeowner described Abraham as "pretty tall" and "heavy built."

Abraham called his cousin and she picked up Abraham at the middle school and Frank at a park. The cousin took the young men to her friend's house, where they

3.

changed clothes. The cousin didn't see any injuries on either Abraham or Frank. Abraham had "the smallest little cut on his face. I barely noticed." Abraham left his knife in his cousin's car; she threw it into a ditch. She later took detectives to where she had thrown the knife and it was recovered.

Officers who responded to Medina's 911 call found a backpack in the house that did not belong to anyone in the Medina family; inside was school identification for Frank. Frank was contacted by Detective Ruben Gomez, received advisements pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and was questioned. Frank told Gomez what he and Abraham had done. Frank told the detective that he and Abraham had texted each other after they left the Medina home.

Detective Gomez also questioned Abraham after *Miranda* advisements were given. Abraham admitted "stabbing" Ryan and his role in the burglary. Abraham also acknowledged that he and Frank texted each other after they fled the Medina home. Gomez searched Abraham's bedroom and found the cell phone.

The detective obtained a search warrant to examine the text messages between Abraham and Frank and he photographed the text messages. During Gomez's testimony about the photographs of the text messages, the photographs were admitted into evidence over Abraham's objection.

Abraham did not present any evidence or testify in his own behalf. He was adjudicated a ward of the court. The probation office prepared a report and recommendation; Abraham's counsel submitted a memorandum in support of probation.

The probation report noted that Abraham admitted he began using marijuana and alcohol at age 13. He denied being a member of a gang, but acknowledged his friends are "Northerners." While at high school, he had been the subject of several disciplinary referrals. The probation officer opined that placing Abraham on probation was not an option; the crimes he committed were serious and violent as set forth in Welfare and Institutions Code section 707, subdivision (b), requiring a custodial placement at disposition.

The probation officer opined that a commitment to the Tulare County Youth Correctional Unit was considered, but rejected, because Abraham needed a longer commitment period than one year. Abraham's rehabilitation required a secure, structured environment and services to address his delinquent and violent behavior. A commitment to the DJJ was recommended because it would best meet Abraham's needs.

The juvenile court committed Abraham to the DJJ, with a maximum term of confinement to be life with the possibility of parole, plus 14 years 4 months, with credit for 310 days in custody.

## DISCUSSION

Abraham raises several issues in this appeal. He challenges the admission of the text messages into evidence. Abraham also challenges the sufficiency of the evidence to support the robbery and attempted murder adjudications, as well as the use of a dangerous weapon enhancement appended to the count 3 assault charge (Medina). He contends the use of a deadly weapon enhancement should be stricken from counts 1, 2, 4, 5, and 6 because use of a weapon is an element of the offense and/or based upon application of section 654. Finally, Abraham contends the juvenile court erred when it placed him at DJJ instead of a less restrictive placement.

## I.     Admission of Text Messages

Frank told Detective Gomez that after he and Abraham fled from the Medina home, they exchanged text messages. The text messages were retrieved and, during trial, Gomez was asked about the content of the messages. Abraham objected on hearsay grounds. The prosecution argued that the messages were part of the conspiracy charge. The juvenile court overruled the objection and admitted photographs of the text messages. On appeal, Abraham contends the text messages were not part of the conspiracy, and the juvenile court erred in overruling the objection.

A juvenile court's evidentiary rulings are reviewed for an abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558.) We conclude there was no abuse of discretion.

As an appellate court, we review judicial action, not judicial reasoning. (*City of National City v. Wiener* (1992) 3 Cal.4th 832, 850 (conc. opn. of Baxter, J.) [well-settled principle of appellate review that correct decision of trial court must be upheld even if based on erroneous reasoning].) If the ultimate result arrived at by the trial court is correct on any theory of the law relevant to the case, it must be affirmed. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329; *Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1.)

We first consider Abraham's challenge on appeal that the prosecution failed to establish an adequate foundation for admission of the text messages. The only objection made to admission of the text messages was inadmissible hearsay. No objection on foundational grounds as to whether Abraham sent the text messages was made. By failing to object on foundational grounds at the adjudication hearing, Abraham is precluded from raising this ground in this appeal. (Evid. Code, § 353; *People v. Gamache* (2010) 48 Cal.4th 347, 371; *People v. Proctor* (1992) 4 Cal.4th 499, 543-544.) Indeed, Abraham conceded in closing argument that he sent the text messages in question.

The text messages sent by Abraham were admissible under Evidence Code sections 1204 and 1220 as a voluntary admission of a party to the proceeding. Regardless of whether the statements can be described as "admissions," the hearsay rule does not require their exclusion when offered against a party declarant. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.)

Frank's text messages to Abraham were admissible under Evidence Code 1221 as adoptive admissions. "'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.'" (*People v. Geier* (2007) 41 Cal.4th 555, 590.) Because Abraham's replies to Frank's text messages reasonably could be interpreted as indicating Abraham knew of the

statements and adopted them as true, Frank's text messages were admissible under Evidence Code section 1221. (*People v. Davis* (2005) 36 Cal.4th 510, 537; *People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

The exchange of text messages also was admissible under Evidence Code section 1223 as they were made within the scope of the conspiracy. (*People v. Sanders* (1995) 11 Cal.4th 475, 516.) Statements from coconspirators are admissible if supported by the admission of evidence sufficient to sustain a finding that it was made during or in furtherance of the conspiracy. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.)

The evidence supports the juvenile court's finding that the text messages were made while the conspiracy was ongoing. (See, e.g., *People v. Noguera* (1992) 4 Cal.4th 599, 625-626 [where conspiracy embraced "successive but interdependent objectives," one of which was securing life insurance proceeds and other property, statements made after homicide but before attainment of proceeds and property were made during conspiracy]; *People v. Hardy* (1992) 2 Cal.4th 86, 143-144 [where primary goal of conspiracy was acquisition of insurance benefits, conspiracy continued until coconspirators received insurance proceeds or were disabled from legally collecting same]; *People v. Saling* (1972) 7 Cal.3d 844, 852 [statements made following homicide but before payment to killer made during conspiracy where payment was one of main objectives of conspiracy as far as defendant was concerned].) The conspiracy was not yet complete at the time the text messages were exchanged as the stated object of the conspiracy, "to make some money," had not been achieved. Furthermore, the text messages were in furtherance of the conspiracy because they were intended in part to aid Abraham and Frank avoid capture and prosecution for their crimes. (See, e.g., *Grunewald v. United States* (1957) 353 U.S. 391, 405 [distinguishing between acts of concealment done in furtherance of main objectives of conspiracy and those done after objectives attained, merely to cover up after crime]; *People v. Hardy*, *supra*, at pp. 145-147 [where attainment of conspiracy's objective hinged on ability to avoid being blamed for homicides, statements made to maintain secrecy and avoid discovery of conspiracy

7.

furthered criminal objective]; *People v. Sully* (1991) 53 Cal.3d 1195, 1231 [statements were made in furtherance of conspiracy where they reasonably could be viewed as attempt to commit potential witness to silence].)

The text messages were admissible under any one of several exceptions to the hearsay rule. The trial court did not abuse its discretion in admitting them into evidence. (*People v. Brady*, *supra*, 50 Cal.4th at p. 558.)

## II.     Sufficiency of the Evidence

There are three main areas where Abraham contends the evidence is insufficient: (1) the attempted murder adjudication; (2) the robbery adjudications; and (3) the section 12022, subdivision (b)(1) enhancement appended to count 3, the assault of Medina.

### A.     Standard of Review

"The standard of appellate review for determining the sufficiency of the evidence is settled. On appeal, '"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] In conducting such a review, we '"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

### B.     Count 3

Abraham contends there is no evidence he used a weapon against Medina. The People agree.

There is no evidence Abraham used a deadly or dangerous weapon in assaulting Medina; he punched him with his fist. The prosecution acknowledged in closing argument that Abraham assaulted Medina with a "punch." The only victim against whom Abraham used a knife was the boy, Ryan.

Regardless of the state of the evidence, however, the section 12022, subdivision (b) enhancement cannot be imposed on a section 245, subdivision (a)(1) charge, which is the offense set forth as count 3. (*People v. McGee* (1993) 15 Cal.App.4th 107, 110.)

The section 12022, subdivision (b) enhancement appended to count 3 must be stricken.

### C. Robbery Adjudications

Abraham contends he did not use force or fear to commit a theft of any kind; his use of force against the victims was used only to effect his escape. He is mistaken on the legal ramification of the timing of his use of force with respect to the robbery counts.

Section 211 defines robbery as the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, by means of force or fear. (§ 211.) The crime is not robbery if the intent to steal is not formed until after the use of force. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056.) The force element of robbery includes a display of aggression that inspires fear. (*People v. Wright* (1996) 52 Cal.App.4th 203, 210-211.)

Robbery has two elements: (1) gaining possession of a victim's property; and (2) asporting or carrying away the property. (*Miller v. Superior Court* (2004) 115 Cal.App.4th 216, 221-222.) The distance the property is asported may be very small. (*People v. Salcido* (1960) 186 Cal.App.2d 684, 687.) The taking must be accomplished by force or fear. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8.)

Contrary to Abraham's contention that the use of force or fear must be simultaneous with the taking, the use of force to attempt to remove property from the victim's presence, or to resist attempts to retake the property, fall within the definition of robbery. (*People v. Anderson* (1966) 64 Cal.2d 633, 638 [where force used in attempting to remove property from owner's presence, robbery is committed]; *People v. Estes* (1983) 147 Cal.App.3d 23, 28 [force used to resist attempts to retake property is force used in furtherance of the robbery and can be used to sustain a conviction].)

Here, Frank and Abraham broke into the home and moved items they intended to steal, including jewelry and electronics, onto the bed in the master bedroom. They also placed an iPod, a charger, headphones, silver dollars, more jewelry, and some video games into a red gym bag. While Abraham and Frank were in the home collecting valuables, Medina and his son returned home. Abraham used force on both Medina and his son.

The asportation, or taking, element of robbery was satisfied when Abraham ransacked the home and placed valuables on the bed in the master bedroom and into the red gym bag. "[F]or purposes of establishing guilt, the asportation requirement is initially *satisfied* by evidence of slight movement." (*People v. Cooper*, *supra*, 53 Cal.3d at p. 1165.) Thus, Abraham's "slight movement" of valuables onto the bed in the master bedroom or into the red gym bag satisfies this element of robbery.

There is no requirement that the use of force occur in the actual taking of the property. Here, the use of force after the taking—in an effort to escape with the stolen property and resist attempts to retake the property—satisfies the force or fear requirement for robbery. Force or fear used to attempt to carry away the property or resist attempts by the owner to retake the property is force or fear used in the commission of robbery. (*People v. Anderson* (2011) 51 Cal.4th 989, 995.) The case of *People v. Hodges* (2013) 213 Cal.App.4th 531, 539-541, relied upon by Abraham in oral argument, is in accord with the foregoing principles.

Consequently, sufficient evidence supports the robbery adjudications. (*People v. Lee*, *supra*, 51 Cal.4th at p. 632.)

**D.     Attempted Murder Adjudication**

Abraham contends the evidence is insufficient to support the attempted murder because the evidence does not show that he harbored express malice aforethought or that he made a direct, ineffectual act toward killing a person. We disagree.

Attempted murder requires a deliberate and premeditated intent to kill or malice aforethought, plus a direct but ineffectual act toward accomplishing the killing. (*People*

10.

*v. Lee* (2003) 31 Cal.4th 613, 623.)  When reviewing a finding that a defendant's actions were done deliberately and with premeditation, appellate courts apply well-established standards.  As explained by our California Supreme Court:

> "In *People v. Anderson* [(1968) 70 Cal.2d 15, 26-27], we identified three categories of evidence relevant to resolving the issue of premeditation and deliberation:  planning activity, motive, and manner of killing.  However, as later explained in *People v. Pride* (1992) 3 Cal.4th 195, 247:  '*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]'  Thus, while premeditation and deliberation must result from '"careful thought and weighing of considerations"' [citation], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly …."'"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332.)

The evidence shows that Abraham armed himself with a deadly weapon, a knife, before breaking into the Medina home.  When Medina and his son returned home, instead of immediately fleeing the scene, Abraham used that deadly weapon to stab and cut a 12-year-old boy multiple times in the stomach, arm, and head.  The victim, Ryan, required extensive stitches and was left with scars.  These are facts from which a reasonable trier of fact could conclude that there was evidence of planning—bringing the knife; time to reflect before using the knife on Ryan, as Abraham chose not to flee the residence immediately after Medina and Ryan returned home but, instead, remained to fight; a deliberate decision on the part of Abraham to use the knife against Ryan when they fought; time to reflect on its use because Abraham stabbed Ryan multiple times; and that Abraham made a direct, but ineffectual step toward killing Ryan by virtue of the fact that he used his knife on Ryan multiple times to the abdomen, head, and arm.

Even if we might have "drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury." (*People v.*

11.

*Perez* (1992) 2 Cal.4th 1117, 1126.)  "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.  (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)  In this case, contrary to Abraham's contention, there is sufficient evidence to support the verdict, and reversal is not warranted.

### III.    Weapon Enhancements

Abraham contends the juvenile court erred in imposing a deadly weapon enhancement on counts 2 and 3.  The People agree with this contention.  Abraham also contends the weapon enhancements appended to counts 1, 4, 5, and 6 should be stricken.  The People contend the weapon enhancements appended to these latter counts should be stayed pursuant to section 654, not stricken.  We agree with the People.

#### A.    Counts 2 and 3

Counts 2 and 3 charged Abraham with violating section 245, subdivision (a)(1).  The charges were found true, along with a section 12022, subdivision (b) enhancement.  A section 12022, subdivision (b) enhancement cannot be imposed on a section 245, subdivision (a)(1) charge.  (*People v. McGee*, *supra*, 15 Cal.App.4th at p. 110.)  We previously addressed the count 3 weapon enhancement in part II, *ante*.  The section 12022, subdivision (b) enhancement appended to count 2 also must be stricken.

#### B.    Counts 1, 4, 5, and 6

Abraham also contends that the weapon enhancements appended to counts 1, 4, 5, and 6 must be stricken based upon section 654 and the holding of *People v. Summersville* (1995) 34 Cal.App.4th 1062.  That case is distinguishable on the counts under consideration.  In *Summersville*, the court concluded that a use of a deadly weapon

12.

enhancement pertaining to victim Fox could not be imposed on an assault with a deadly weapon charge because the weapon use is an element of the offense. (*Id.* at p. 1070.) The court also held the enhancement could not be imposed on the murder charge pertaining to victim Burke because Summersville did not personally use a knife on Burke.

The weapon enhancements should not be stricken, as Abraham contends, because he personally used a knife to commit all of the offenses. Instead, they should be stayed pursuant to section 654. In *People v. Wynn* (2010) 184 Cal.App.4th 1210, the appellate court held that section 654 applies to an enhancement for use of a deadly or dangerous weapon when the defendant also is convicted of an underlying offense that arose out of the use of the weapon. (*Wynn*, at pp. 1218-1221.)

Although the California Supreme Court has yet to definitively decide this issue, the People concede that section 654 should apply to the enhancements. The juvenile court having previously stayed all terms of commitment for offenses and enhancements, except for the count 1 offense and enhancement, we order the term of commitment imposed for the weapon enhancement appended to count 1 also be stayed pursuant to section 654.

## IV.    Commitment to DJJ

Abraham's final contention is that the juvenile court abused its discretion when it committed him to the DJJ instead of a less restrictive environment. We disagree.

### A.    Standard of Review

A juvenile court's commitment decision may be reversed on appeal only upon a showing the juvenile court abused its discretion. (*In re Todd W.* (1979) 96 Cal.App.3d 408, 416.) In evaluating the record, we apply the substantial evidence test. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 579.) The reviewing court indulges all reasonable inferences in support of the juvenile court's decision. (*In re Asean D.* (1993) 14 Cal.App.4th 467, 473.)

A DJJ commitment must conform to the general purpose of the juvenile court law. (Welf. & Inst. Code, § 202; *In re Todd W.*, *supra*, 96 Cal.App.3d at p. 417.) Legislation enacted in 1984 recognized punishment as a rehabilitation tool and shifted the "emphasis from a primarily less restrictive alternative approach oriented towards the benefit of the minor to the express 'protection and safety of the public' [citations], where care, treatment, and guidance shall conform to the interests of public safety and protection." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1396.) The disposition also must evidence probable benefit to the minor and that less restrictive alternatives would be ineffective or inappropriate. (Welf. & Inst. Code, § 202, subd. (e); *In re Teofilio A.*, *supra*, 210 Cal.App.3d at p. 576.)

A juvenile court is not required to attempt less restrictive alternatives before ordering a specific commitment. (*In re Asean D.*, *supra*, 14 Cal.App.4th at p. 473.) "[I]f there is evidence in the record to show a consideration of less restrictive placements was before the court, the fact the judge does not state on the record his consideration of those alternatives and reasons for rejecting them will not result in a reversal." (*In re Teofilio A.*, *supra*, 210 Cal.App.3d at p. 577.)

### B. Analysis

Applying these principles, we conclude the juvenile court acted within its discretion by placing Abraham at the DJJ. The probation officer's report noted that Abraham had minimal substance abuse issues in that he had a history of marijuana use; Abraham had been the subject of disciplinary referrals at his high school for disruptive behavior and inappropriate comments to school officials; and his parents discounted his actions and, in fact, believed he was justified in attacking the victims because he was "defending" himself. The probation officer noted that the offenses were numerous and violent and severe in nature; Abraham inflicted great bodily harm on two victims; and a great deal of planning had gone into the commission of the offenses. The probation officer expressed concern over the parents' belief that Abraham had a right to use a knife for his "protection" against a victim while Abraham was committing a burglary and that

14.

Abraham had been "charged excessively." The parents continued to discount the severity of Abraham's behavior, blaming the victims and the district attorney's office for Abraham's predicament.

The probation report states that the department considered, and rejected, less restrictive commitment options. The department opined that Abraham was in need of a commitment program longer than the one-year program offered in the local youth authority facility. Abraham also was in need of services to address his delinquent and violent behavior so that he would not reoffend upon release. The department also felt that Abraham needed to be in a secure and structured environment for the protection of the public, as well as to address his own issues.

The department recommended a commitment to DJJ, where Abraham would be in a secure and structured environment, supervised 24 hours a day. This would ensure the safety of the community. While at the DJJ, Abraham would receive services, treatment, and counseling to address his violent behavior and other issues. He also would be able to complete his high school education while at DJJ.

At the hearing, the juvenile court heard argument over the commitment recommendation. Abraham's counsel argued that boot camp was the appropriate alternative, based in part on Abraham's family support and concern over the effects of a DJJ commitment. The People argued for a DJJ commitment based on the severity of the offenses and the disregard for the victims. The juvenile court also accepted a statement from Abraham, a victim's statement, a psychological evaluation of Abraham proffered by Abraham, letters from Abraham's family, and the probation report.

After considering all of the argument and evidence submitted on the commitment decision, the circumstances of the offenses, and the mitigating and aggravating factors, the juvenile court determined that a commitment to DJJ was appropriate because it would provide the structure and services Abraham needed, in addition to providing a secure setting for the protection of the public.

The record before us demonstrates no abuse of discretion by the juvenile court. (*In re Teofilio A.*, *supra*, 210 Cal.App.3d at p. 577.)

## DISPOSITION

The section 12022, subdivision (b) enhancements appended to counts 2 and 3 are stricken. The imposition of a term of commitment for the section 12022, subdivision (b) enhancement appended to count 1 is stayed pursuant to section 654. In all other respects, the commitment is affirmed. The juvenile court is directed to prepare an amended commitment order conforming to this opinion.

_____

PEÑA, J.

WE CONCUR:


_____

WISEMAN, Acting P.J.


_____

DETJEN, J.