Filed 1/21/15  In re G.J. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re G.J. et al., Persons Coming Under the Juvenile Court Law. | B255155 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EVELYN T. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. BK02302) |

APPEAL from orders of the Superior Court of Los Angeles County, Tony L. Richardson, Judge.  Reversed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Evelyn T. (mother).

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant Montell J. (father).

Richard D. Weiss, Acting County Counsel; Dawyn R. Harrison, Assistant County Counsel; and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Evelyn T. and Montell J. appeal from the juvenile court's jurisdiction and disposition orders declaring their sons G.J. and R.T. dependent children of the court and placing them in foster care. Appellants argue the court erred by finding jurisdiction under Welfare and Institutions Code section 300, subdivision (b)[1] based on a substantial risk of emotional harm to the children, rather than on risk of physical harm. They further argue there was insufficient evidence to support the court's removal order under section 361, subdivision (c). We reverse and remand for a new jurisdictional hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Referral and Detention

#### 1. Events preceding the section 300 petition

On February 13, 2014, Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging emotional abuse and general neglect of two male siblings: R.T., then twelve years old, and G.J., then sixteen years old. The caller alleged R.T. had been hospitalized for a nasal infection that had extended into his brain. On the day R.T. was scheduled to be discharged, his mother, Evelyn T. (Mother), requested that the hospital keep the child until she was able to move into a new apartment. Mother claimed there were "demons and spirits at the [current] apartment that liked to throw things." Mother showed hospital staff a video of the "spirits," which appeared to show her older son G.J. throwing objects. The caller also reported the children's father, Montell J. (Father), had "severe mental issues" and that R.T. had made "bizarre" comments about having seen a floating guitar inside the apartment. The parents' landlord informed the caller that the family lived in unsanitary conditions, which the parents blamed on the "spirits."

DCFS interviewed several hospital employees about the allegations. An emergency room social worker reported that Mother had said she and G.J. slept outside

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated

2

the apartment "due to the spirits in the home." Mother also said she intended to keep sleeping outside until the family moved to a new apartment.

A hospital nurse reported that R.T. initially visited the emergency room on January 11, 2014 with "what appeared to be a sinus infection and was sent home." The child returned to the hospital three days later "and it was discovered that the infection had spread to [his] brain." A neurosurgeon was called to suction out pus that had gathered in R.T.'s brain. Following the procedure, R.T. remained hospitalized and was continuing to receive antibiotics through an intravenous line. A hospital "home team" was scheduled to visit the family's apartment and train them to administer the intravenous antibiotics. However, shortly before the visit, Mother told hospital personnel the apartment was "not suitable" for R.T. because "of spirits in the home."

DCFS interviewed R.T. in the hospital. The child stated that he lived in a motel with Mother, G.J. and "sometimes" Father. R.T. indicated he could not return to the motel because "'[t]here [were] spirits there.'" R.T. said he had seen his brother's guitar "'play a tune by itself,'" explaining that "the strings on the guitar [had] mov[ed] with no one playing it." R.T. also said his family told him they had seen objects flying around the apartment and that there were "holes in the ceiling . . . from the spirits throwing cans in the air." G.J. and Mother both told R.T. they had been struck by the cans. Although R.T. had not seen the spirits throw any objects, he claimed that he had seen a spirit "c[o]me down from the ceiling" and "from the television." R.T. denied having ever heard voices or "having any past or present suicidal or homicidal thoughts."

Prior to his hospitalization, R.T. had been attending school in Long Beach. However, he stated that he did not like school and would now be "home school[ed]." R.T. told DCFS he had never been physically disciplined and had never seen his parents engage in domestic violence or use drugs. R.T. said he felt safe in his parents' care and that they always provided enough food to eat.

DCFS visited Mother at the family's motel room, which was "extremely cluttered, dirty and unorganized." DCFS observed potatoes and a broken hot plate on the floor and

several plants that had trash in their pots. The motel room was also filled with smoke from sage Father had been burning to "ward off evil spirits."

Mother informed DCFS that the family intended to move to room eight because their current room was inhabited by "'spirits and demons.'" Mother pointed out several "half crescent dents" in the ceiling that were allegedly caused by cans the spirits had thrown. Mother also reported the spirits had "thrown potatoes" and smashed a hot plate appliance against the wall. Father and G.J., who were also present, agreed with Mother.

Mother told DCFS the family had been living at the motel for the past five months and that the spirits had been present for the last month. She hoped to move to room eight before R.T. returned from the hospital because it was large and had a private bathroom. Mother reported that she and G.J. had both been hit by cans and were currently sleeping on the back porch. Mother also stated that she had asked "Chaplin Felix," who worked at the Beacon Light Mission, to come to the home. According to Mother, Chaplin Felix "informed the family that he heard voices over a telephone from the spirits saying that they should have killed [R.T.]"

Mother admitted she had been diagnosed with depression in 2007 and was not currently receiving treatment or taking medication. She also said Father had been diagnosed with bipolar disorder and was not currently taking medication. Mother also said Father used marijuana, but did not smoke inside the motel room. Mother denied ever using physical discipline with her children and denied hearing voices or experiencing suicidal or homicidal thoughts.

DCFS also interviewed G.J., then 16, who thought the agency had come to the motel because of the "'paranormal activity with the spirits.'" G.J. reported that the spirits had been throwing cans and other objects around the motel room. G.J. stated that he and his Mother had begun sleeping on the back porch because they were afraid of the spirits. G.J. offered to play DCFS a video showing the spirits. The screen image showed Father walk into the room with incense; Mother then dropped the camera and claimed to have been hit with a can. G.J. explained that a beeping sound heard on the video was an "EMF detector" used to detect sprits. G.J. denied hearing any voices or having ever experienced

4

any suicidal or homicidal thoughts. He also denied having any past mental illness diagnosis or treatment.

G.J. informed DCFS that Mother took R.T. to the hospital whenever he got sick. G.J. also said Mother and Father always provided sufficient food and had never engaged in physical discipline or domestic violence. He stated that his Father smoked marijuana outside the motel room and had a medical license to use the drug. G.J. denied ever using drugs. Although he was enrolled at Poly High School, G.J. had not attended class for the past month due to his brother's medical condition.

DCFS also interviewed Father, who reiterated most of the information Mother had provided. Father blamed the spirits for damaging the motel room by throwing cans, potatoes and other objects. He also said Chaplin Felix had said that "he heard voices over the telephone that stated [the spirits] should have killed [R.T] and other horrible things." Father said he had been diagnosed with bipolar disorder and prescribed "zyrexa." Father occasionally went to "mental health" to get his medication. He denied hearing voices, having hallucinations or experiencing suicidal or homicidal thoughts. Father admitted he smoked marijuana and provided DCFS a copy of his medical marijuana card. He informed DCFS that the family would like to live in room eight "so that they can bring [R.T.] home and take care of him."

DCFS also interviewed the motel manager, who reported that the family had been living at the property "on and off" for years. The manager said they had recently started complaining about the "spirits." On one occasion, the parents brought the manager into the room to show him the spirits. The manager saw Father "quickly throw a can into the air and it hit the ceiling." The parents tried to convince the manager the spirits had thrown the can. The manager believed Father was teaching Mother and the children "how to throw the cans."

The manager said he had initially told the family they could move to room eight, which was newly remodeled, because he thought it would be good for R.T. However, when the motel owner discovered the parents' current room had been damaged by cans, he would not allow the manager to move them into room eight. DCFS contacted the

owner, who reported that he was preparing to evict the family as a result of the damage they had done to their room. The owner also reported he had recently had to call the police because Father threatened to burn the building down.

DCFS interviewed Chaplin Felix, who met the family at the Beacon Light Mission. Felix reported he spoke with Mother on the phone while she was at the hospital visiting R.T. During the call, Felix asked Mother to put R.T.'s physician on the phone. Mother put Felix on hold and the phone was then disconnected. Mother immediately called Felix back "and stated she heard a voice on the phone that sounded like him that made negative comments about [R.T.] such as 'You're going to regret this' and statements referring to the child dying." Felix then told Mother he had not made those statements and that the call had been disconnected. Felix told DCFS the parents had informed him about the spirits and he had advised them to move out of the motel.

### 2. *Section 300 petition and detention*

On February 20, 2014, DCFS filed a petition alleging G.J. and R.T. fell within the jurisdiction of the juvenile court under section 300, subdivision (b). The petition included three counts under subdivision (b). The first count alleged Mother had untreated "mental and emotional problems, including a diagnosis of depression" that rendered her unable to care for the children and placed them at "risk of physical harm, damage and danger." The second count included substantially identical allegations against Father, asserting that he had a prior, untreated "diagnosis of bi-polar" that rendered him incapable of caring for the children and placed them at substantial risk of physical harm. The third count alleged Father had a "history of illicit drug abuse and is a current user of marijuana." Count three further alleged Mother had failed to protect the children from Father's drug use, which "endanger[ed] the children's physical health."

In support of the petition, DCFS filed a detention report summarizing its interviews with hospital personnel, the family members, the motel manager and Chaplin Felix. The detention report indicated R.T. was still being held in the hospital hold and that G.J. had been placed in a group foster home.

6

The report disclosed the parents had a "long history of involvement with Child Protective Services in Los Angeles and Baton Rouge, Louisiana." According to the report, Mother had eight other children who had been taken from her custody and were now adults. The prior child welfare history listed seven prior referrals involving Mother and Father. Two referrals related to Mother's now-adult children. The other five related to G.J. and R.T. In 1997, two referrals were filed alleging "general neglect" of G.J.; both were deemed "unfounded" or "inconclusive." Another referral was filed in 2001 alleging Mother had tested positive for marijuana immediately after giving birth to R.T. The allegations were substantiated and the children were taken into protective custody. They were returned to the parents in January of 2003. A 2006 referral alleged Mother had tried to put a tattoo on G.J., causing bruising on his arms and legs. The parents were reportedly uncooperative with DCFS: Mother fled to Louisiana with G.J. and Father was later arrested with R.T. Mother eventually returned to California and the 2006 case was dismissed. Finally, in 2010 DCFS received a referral for general neglect after the family was found living under a tarp. The allegations were deemed inconclusive and the children were again returned to the parents.

In its recommendation and evaluation, DCFS concluded the parents were unable to provide R.T. the "sterile, neat and clean environment" he required for his intravenous antibiotic treatments. DCFS further asserted that the parents' "untreated mental illness," "neglect[ of G.J.'s] . . . education[al] needs" and "twenty-five year history with the DCFS" demonstrated a "lack of concern for the children's safety." DCFS recommended a wide range of services for Mother, Father and the children, including individual counseling, parenting classes, substance abuse treatment and psychiatric evaluations of each family member.

At the detention hearing, the juvenile court found there was prima facie evidence the children were persons described in section 300 and that leaving them in the home of parents would create a substantial risk to their physical health or emotional well-being. The court permitted monitored visitation and ordered the children and parents to undergo

7

a physical and psychiatric assessment.   The matter was set for a contested jurisdiction and disposition hearing on March 6, 2014.

### B. Jurisdiction and Disposition

#### 1. DCFS's jurisdiction/disposition report

On March 4, 2014, DCFS provided a "Jurisdiction/Disposition Report" summarizing additional interviews it had conducted during its investigation.  G.J., who remained in a foster home, denied that he had been neglected by his parents.  He remained adamant that "paranormal activity" had caused "cans, TVs, VCRs" to be "thrown all over the place."  G.J. showed DCFS another video that purportedly  showed the "spirits."  The video showed books falling through the air and the front half of a shoe moving across a bed.  The video did not show what was causing these objects to move.  G.J. reported that neither of his parents took any medication.  He admitted Father used marijuana, but not "in the house" or "around" any other family members.  G.J. stated he had never actually seen his father use marijuana.

DCFS reported that R.T. had recently been discharged from the hospital and was placed in a foster home where he was continuing to receive intravenous antibiotic treatments.  His last treatment was scheduled to occur in one week.  R.T. told DCFS he thought the agency had placed him in the foster home because the family's motel room was inhabited by spirits.  He reported that Mother had shown him a video of the spirits and that he "knew for a fact" there were spirits present at the motel.  R.T. did not believe his parents took any medication and had never seen them use drugs.  DCFS reported that both children appeared to be "developing appropriately."

DCFS reported that the parents were refusing to cooperate with the agency and would not sign forms permitting a mental health examination of the children.  On February 26, 2014, Mother told DCFS she would not talk to any more social workers, "that everything in the Detention Report was lies" and that she intended to prepare her own report.  Later the same day, Mother sent a series of texts alleging that she believed R.T.'s life was in danger while in the care of DCFS and that the Agency and the juvenile

court were subjecting her to "mental abuse." On February 27, Mother informed DCFS that neither she nor Father would meet with the agency.

DCFS also interviewed the motel manager, who reported that the parents would be leaving the property at the end of the month. The manager stated that Father brought him into the motel room to show him the spirits. However, all the manager saw was "the three of them [Mother, Father and G.J.] throw stuff." The manager believed the parents were teaching G.J. "to do it. To lie [about the spirits]."

In its assessment and evaluation, DCFS reported that "it was unknown if the family's home's unsanitary condition caused [R.T.] to get an infection." Hospital staff, however, believed "the parents acted appropriately in dealing with [R.T.'s] illness, as they brought him to the Emergency Room with a sinus infection initially, then returned several days later when [R.T.'s] condition did not improve." DCFS nonetheless concluded the parents' "mental and emotional problems" rendered them incapable of caring for the children. According to DCFS, its investigation made "clear that both the mother and father have severe mental health concerns that are affecting the family's level of functioning. The parents have failed to maintain a suitable living environment for the children. Further, the parents' mental health appears to be negatively affecting the children as they now also believe that there are spirits in the home throwing things and creating a hazardous environment." DCFS also asserted that Father was an "abuser of marijuana" and Mother failed to protect the children from his drug use. DCFS concluded the children were "not safe in the home" because the parents had "failed to address the[ir] problems" and refused to cooperate with the agency, making any further assessment of their mental condition impossible. DCFS recommended the court sustain the petition, order the children removed from the home and deny reunification services pursuant to section 361.5, subdivision (b)(10).

2. *Hearing on jurisdiction and disposition*

G.J. was the only witness who testified at the jurisdiction and disposition hearing. G.J. stated that his parents had always provided him with sufficient food and clothing and

9

met all his other needs. G.J. further testified that his parents had never physically abused him. He felt safe in their care and wanted to continue living with them.

At the conclusion of G.J.'s testimony, the court invited the parties to present argument on jurisdiction. DCFS argued that although it did not believe the children were "being physically abused in the home," it was concerned about "the mental health state of both parents." DCFS asserted the parents had a "long standing history. . . of mental health issues" and that their recent comments about "spirits" showed those issues remained "unresolved." DCFS also argued that several "examples" demonstrated the parents' mental health issues placed the "children . . . at risk" of physical harm: (1) "mother and [G.J.] were sleeping outside"; (2) G.J. had been "out of school for over a month"; (3) the children had become "caught up in the parents' delusions and [were] supporting the parent's delusions"; (4) the parents conduct showed they were incapable of making rational decisions or maintaining "a stable home"; and (5) Father refused treatment for his bipolar disorder.

Counsel for the children agreed that the court should sustain the petition and assert jurisdiction over the children. Counsel argued that the evidence showed the parents' mental condition was "adversely impact[ing] the mental health of the children" as evidenced by the fact the children now appeared to believe the spirits and demons were real. Counsel was also concerned by Mother's statement that Chaplin Felix had told her he heard the spirits saying they should have killed R.T. Counsel argued that these statements raised concerns about the "escalation . . . of spirits and demons and what they want to do to my client[s]." Counsel believed DCFS's evidence showed the children were "at risk of serious physical harm as a result of the parents' mental health condition."

Father's counsel, however, argued that DCFS had failed to identify "any information that indicates how these children have been abused or neglected as a result of the parents' mental health issues." According to counsel, there was no evidence "establish[ing] a nexus between the mental health concerns and a danger to these children's physical or emotional well-being." Mother's counsel reiterated these arguments, asserting there was no "nexus between the alleged mental health and

10

substantial risk of serious illness or harm to the children." Mother's counsel explained that the children had consistently denied being abused by their parents, felt safe in their parents' care and wanted to remain in their custody. Mother's counsel also noted that DCFS reports showed the parents had acted appropriately when R.T. developed his nasal infection. Finally, counsel for both parents asserted the prior dependency matters were irrelevant because none of those referrals involved the allegations pertaining to the parents' mental health.

The court found both children were persons described in section 300, subdivision (b). Although the court acknowledged that mental illness was not in itself a proper basis for jurisdiction, it believed DCFS's evidence showed the parents' illness was threatening the children's emotional well-being: "It seems to me that . . . counsel are focused more on the harm from a physical standpoint but not really addressing the issue with respect to the emotional toll that would be taken on minors with respect to the issues that seem to exist here. And it is the emotional toll I would be most focused on. It seems the mental-health issues . . . can have an impact on the safety, the health, and the emotional well-being of the child and can also result in some emotional abuse, not the least of which was . . . this notion that there are spirits who might heap some harm on one of the children to the extent of even killing of the children. If there are mental health issues and if there are those kind of thoughts flying around, I think we ought to be very concerned about what kind of toll it would take on this family . . . So I am going to sustain the counts as pled. . . I will find by a preponderance of the evidence that count (b)(1), (b)(2) and (b)(3) of the petition to be true as alleged and, therefore, find the children to be persons described by . . . section 300."

The court then invited the parties to provide argument on disposition. DCFS argued the children should be removed from the home and that the court should deny reunification services under section 361.5, subdivision (b)(10). (See *In re Albert T.* (2006) 144 Cal.App.4th 207, 217 [under § 361.5, subd. (b)(10), court may deny reunification services if it finds: "(1) the parent previously failed to reunify with a sibling [or half sibling] and (2) the parent has not subsequently made a reasonable effort to treat

11

the problems that led to removal of the sibling [or half sibling]”].)  Mother and Father argued that subdivision (b)(10) was inapplicable because their mental health problems had not been at issue in any of their prior dependency proceedings.  Children's counsel agreed, asserting the parents should be provided an opportunity to reunify.

The court ruled that returning the children to the parents' care would create a substantial risk to their physical or emotional well-being and that there were no reasonable means by which the children could be protected without removing them from their parent's physical custody.  The court did permit reunification services, which included monitored visits and mental health counseling.  Father was ordered to participate in random drug testing.

## DISCUSSION

Mother and Father appeal the juvenile court's jurisdiction and disposition orders, arguing that:  (1) the juvenile court erred when it found jurisdiction under section 300, subdivision (b) based on risk of emotional harm to the children; (2) DCFS failed to prove the children would be at substantial risk of physical or emotional harm if left in the parents' custody (see § 361, subd. (c)(1)); and (3) the court abused its discretion when it ordered monitored, rather than unmonitored, visits.

### A.  *The Trial Court Erred in Finding Jurisdiction Under Section 300, Subdivision (b)*

#### 1.  *Summary of section 300, subdivision (b) and standard of review*

To establish jurisdiction under section 300, subdivision (b), DCFS must prove by a preponderance of the evidence that “[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness” caused by any of the following:  “the failure or inability of the [parent] to adequately supervise or protect the child; “the failure to provide the child with adequate food, clothing, shelter, or medical treatment”; or “the inability to provide regular care for the child due to the parent's mental illness, developmental disability or substance abuse.”  (§ 300, subd. (b).)

12

"The statutory definition [therefore] consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) The third element "requires a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]" (*In re Savannah M.* (2005)131 Cal.App.4th 1387, 1396.) DCFS "has the burden of showing specifically how the minors have been or will be [physically] harmed." (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) "'[H]arm may not be presumed from the mere fact of mental illness of a parent'" (*In re A.G.* (2013) 220 Cal.App.4th 675, 684) or "the mere usage of drugs by a parent." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 765 (*Drake M.*).)

"Ordinarily we review the juvenile court's jurisdiction findings for substantial evidence. [Citations.] However, the proper interpretation of a statute and the application of the statute to undisputed facts are questions of law, which we review de novo." (*In re R.C.* (2011) 196 Cal.App.4th 741, 748.)

2. *The trial court erred in sustaining counts b-1 and b-2 based on risk of emotional harm rather than physical harm*

Counts b-1 and b-2 allege that Mother (b-1) and Father (b-2) suffer from mental and emotional problems that render them incapable of caring for the children. The parents argue the juvenile court erred in sustaining counts b-1 and b-2 because it "did not make any finding that [G.J. and R.T.] had suffered, or there was a substantial risk that [either] child would suffer, serious physical harm or illness. . . . Instead the court [found] that the parents' mental health may affect the children's emotional-well being." According to the parents, subdivision (b) requires a finding of risk of physical harm, not emotional harm.

Parents are correct that section 300, subdivision (b) does not provide "for jurisdiction based on 'emotional harm.'" (See *In re Daisy H.* (2011) 192 Cal.App.4th

13

713, 718 [subdivision (b)].)  As explained by one court, "subdivision (b) means what it says.  Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of serious physical harm or illness.'  [Citation.]"  (*In re Nicholas B*. (2001) 88 Cal.App.4th 1126, 1137.)  Thus, absent evidence of serious physical harm or risk of such harm, emotional injury is not a basis for jurisdiction under subdivision (b).  Section 300 contains a separate subdivision—subdivision (c)—that provides jurisdiction based on conduct resulting in emotional damage or substantial risk of emotional damage to the child.  (See § 300, subd. (c) [jurisdiction proper where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage . . . as a result of the conduct of the parent"].)  However, subdivision (c) was not alleged as a basis for jurisdiction in this case

The record also supports the parents' assertion that the juvenile court's jurisdiction order was based on a finding of risk of emotional harm rather than risk of physical harm.  When ruling on jurisdiction, the court explained that while the parties' arguments had "focused on the harm from a physical standpoint," the court was concerned the parents' "mental health issues" were taking an "emotional toll" on the children and threatening their "emotional well-being."  The court never referenced any type of physical harm.

DCFS does not dispute that the court predicated its jurisdictional finding on risk of emotional, rather than physical, harm.  The Agency contends, however, that we may nonetheless affirm the court's jurisdiction order because the record contains sufficient evidence to support a finding of risk of physical harm.  DCFS argues the following evidence shows risk of physical harm:  (1) Mother and Father threw cans and other objects around the motel room;[2] (2) Mother slept with G.J. on the back porch of the

---

[2]     DCFS argues for the first time on appeal that "[i]t is not hard to imagine the children being injured by the flying objects father and mother threw."  DCFS did not raise this argument in the juvenile court nor did it ever suggest that the children had been or might be placed in physical danger due to the flying objects.

apartment;[3] (3) the children were "brought into the web of belief that spirits and demons were haunting their home";[4] (4) Mother mentioned that Chaplin Felix heard the spirits say they should have killed R.T.  DCFS contends that because this evidence would have supported a finding of risk of physical harm, we may affirm the juvenile court's ruling regardless of whether it was "wrongly based . . . on risks posed to the children's emotional well-being."

DCFS has cited no case holding that when the juvenile court erroneously sustains a subdivision (b) allegation based on a finding of risk of emotional harm, we may affirm the order if the record contains evidence that would have supported a finding of risk of physical harm.  Instead, DCFS argues we should affirm the court's order under the general rule that a "decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

DCFS, however, overlooks an important exception to this "rule of nonreviewability of a trial court's reasons for its decision." (*City of National City v. Wiener* (1992) 3 Cal.4th 832, 850-851.)  As explained by our Supreme Court, this rule does not apply "where the trial court has refused to pass on an issue and disposes of the case on an entirely different ground.  If the trial court thus chose an improper ground, an appellate court will not uphold the judgment on the ground *not* addressed by the trial court, *if* resolution of that issue depends upon conflicting evidence." (*Ibid*.)  That is the situation here.  The trial court found jurisdiction under subdivision (b) based on an "improper ground," concluding that the parents' mental illness presented a risk of

---

**3**    DCFS argues "[t]he option to sleep outside in the winter or any night" places a child at "great risk of harm."  There is, however, no evidence in the record suggesting that G.J. was harmed or placed at risk of harm by sleeping outside.  Indeed, there is no evidence whatsoever regarding the conditions on the porch where Mother and G.J. slept.

**4**    DCFS does not explain how these "beliefs" placed the children at substantial risk of physical harm.

emotional harm to the children. The juvenile court did not address whether the parents' mental illness presented a substantial risk of physical harm to the children, which was (and remains) a disputed factual issue. Because "[t]he trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case" (*Drake M., supra*, 211 Cal.App.4th at p. 766), it would be improper to make that determination in the first instance on appeal. (See *In re A.E.* (2014) 228 Cal.App.4th 820, 827 [reviewing court "do[es] not pass on the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence"].)

Generally, when the trial court court's application of an incorrect legal standard keeps it from resolving factual disputes, the proper remedy is to reverse and remand for a new hearing under the proper standard. (*In re Charlisse C*. (2008) 45 Cal.4th 145, 167 [rehearing proper remedy where juvenile court applied wrong legal standard]; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 803 [remand for further fact finding appropriate where trial court's application of incorrect legal standard keeps it from resolving factual disputes].) In this case, the juvenile court effectively applied an incorrect legal standard when it found jurisdiction under subdivision (b) based on risk of emotional, rather than physical harm. As a result of this incorrect legal standard, it did not make any finding on the issue of physical harm. We therefore remand the matter to permit the court to hold a new jurisdictional hearing on counts b-1 and b-2. On remand, the parties may present additional evidence related to those counts.

### 3. *The record contains insufficient evidence to sustain count b-3*

The juvenile court also sustained count b-3, which alleges Father "has a history of illicit drug use and is a current user of marijuana." The count further alleges that Father's drug use places the children at substantial risk of physical harm and that Mother failed to protect the children from those risks. At the jurisdictional hearing, DCFS did not present any argument related to count b-3 and the juvenile court did not provide any explanation for sustaining the count.

16

To establish jurisdiction under section 300, subdivision (b) based on drug use, DCFS must prove "the parent at issue is a substance *abuser*" and that such conduct caused physical harm to the child or places the child at substantial risk of physical harm. (*Drake M., supra*, 211 Cal.App.4th at pp. 766-767 [italics in original]; see also *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217-1220 [although § 300, subd. (b) requires finding of "substance abuse," the statute does not define the kinds of parental actions that qualify as "abuse"].) The only information in the record regarding Father's marijuana use is that he holds a medical marijuana card, he occasionally smokes marijuana when outside the family residence and, on one occasion, a nurse believed Father was "under the influence" while visiting the hospital. Standing alone, this evidence shows nothing more than that Father occasionally uses medical marijuana, which "is not a sufficient basis on which dependency jurisdiction can be found." (*Drake M., supra*, 211 Cal.App.4th at p. 764; see also *In re Alexis E.* (2009) 171 Cal.App.4th 438, 453 ["use of medical marijuana, without more, cannot support a jurisdiction finding that such use brings the minors within the jurisdiction of the dependency court"].)

DCFS appears to concede there is insufficient evidence to support a jurisdictional finding predicated on Father's marijuana use. Its appellate brief does not argue that the juvenile court was correct in sustaining count b-3 nor does the brief attempt to identify any evidence that would support such a finding.[5] Because the record contains no evidence establishing Father's marijuana use placed the children at physical risk of harm, we reverse the juvenile court's finding on count b-3 and dismiss the count.

---

[5] Rather than attempt to defend the juvenile court's finding on count b-3, DCFS argues only that we "need not consider the [parents'] jurisdictional challenge based on father's marijuana use" because jurisdiction was proper under counts b-1 and b-2. As discussed above, however, we conclude the court erred in sustaining counts b-1 and b-2 and must therefore address the b-3 count.

### B. *On Remand, DCFS Shall Comply With ICWA Notice Provisions*

Parents also claim that DCFS did not adequately comply with the Indian Child Welfare Act's notice provisions. (See 25 USC § 1912, subd. (a); Welf. & Instit. Code, § 224.3.) During the dependency proceedings, Mother informed DCFS she might have Native American ancestry in the "Blackfoot" and "Cherokee" tribes. DCFS alleges that after receiving this information it sent ICWA notices to several Cherokee tribes, the BIA, and the Secretary of the Interior. DCFS admits, however, that it did not send notice to the Blackfeet tribe and that the record does not contain return receipts for the notices it did send. (See *In re Robert A.* (2007) 147 Cal.App.4th 982, 989 ["To enable the juvenile court to review whether sufficient information was supplied, Agency must file with the court the ICWA notice, return receipts and responses received from the tribes"].) DCFS "does not oppose . . . remand to effectuate proper ICWA notice." Accordingly, on remand, the juvenile court shall direct DCFS to comply with all ICWA notice requirements.

### DISPOSITION

The jurisdiction order is reversed and count b-3 of the petition is dismissed. The disposition order is vacated. The matter is remanded to the juvenile court for a new jurisdictional hearing on counts b-1 and b-2. The juvenile court is also directed to order DCFS to give proper ICWA notice and file all required documentation with the court.

ZELON, J.

We concur:

PERLUSS, P. J.                                    WOODS, J.

18